**ANDERSON, et al., Plaintiffs,**

v.

**BANKS, et al., Defendants.**

**JOHNSON, et al., Plaintiffs,**

v.

**SIKES, et al., Defendants.**

**Nos. CV478–138, CV479–323.**

United States District Court,
S. D. Georgia,
Savannah Division.

June 17, 1981.

---

Richard D. Phillips, Ludowici, Ga., for plaintiffs in No. CV478–138.

J. Franklin Edenfield, Swainsboro, Ga., M. Francis Stubbs, Reidsville, Ga., for Ben F. Sikes, in both cases.

B. Daniel Dubberly, Jr., Glennville, Ga., Charles Rippin Adams, Adams, Brennan & Gardner, Savannah, Ga., for defendants in both cases.

David Arnold, Ga. Legal Services Programs, Central Office, Atlanta, Ga., for plaintiffs in No. CV479–323.

Spivey & Carlton, P. C., Swainsboro, Ga., for defendants in No. CV479–323.

## OUTLINE

I. Background of the Cases ....... ............ ——
II. Jurisdiction ................................. ——
III. Historical Background ........................ ——
 A. Tattnall County ...................... ..... ——
 B. The School System ......................... ——
 C. The History of Segregation in Tattnall County .. ——
 D. The Tracking System ...................... ——
IV. The Test .................................... ——
 A. Its Inception ............................. ——
 B. Its Implementation ....................... ——
 C. The Racial Impact of the CAT Requirement .... ——
 D. The CAT Itself .......................... ——
 E. The CAT in Tattnall County ................ ——
 F. The Benefits ............................. ——
V. Special Placement ............................ ——
VI. The Legal Conclusions ......................... ——
 A. The Racial Discrimination Claims ............ ——
 1. The Equal Protection Claims ............. ——
 2. Statutory Claims ...................... ——
 B. The Due Process Claims ..................... ——
 C. The Claims of Those Students Classified as Mentally Retarded .......................... ——
 1. The Effect of the Diploma Policy on Children Accurately Classified .................... ——
 2. The Effect of the Diploma Policy on Those Misclassified as Mentally Retarded ........ ——
 3. The Equal Protection Claims of the Handicapped .............................. ——
VII. Summary ................................... ——

## ORDER

B. AVANT EDENFIELD, District Judge.

I. *Background of the Cases, the Claims and Causes Involved*

The impetus for this litigation was the institution by the Tattnall County School District of an exit examination. Beginning with the graduating class of 1978, all diploma candidates have been required, in addition to other already existing diploma requirements, to achieve a grade equivalency score of 9.0 on both the mathematics and reading sections of the California Achievement Test (CAT). Claims were initially raised in an administrative proceeding which progressed from the local school board, to the State Board of Education, and ultimately to the Georgia Court of Appeals. The issues raised in that proceeding were: (1) whether the Tattnall County School Board had the authority under state law to adopt an additional graduation requirement; and (2) whether a violation of the equal protection clause had occurred since a greater burden was placed on the students of Tattnall County than on the students in other Georgia counties. The first suit in this Court challenging the exit exam, styled as *Wells v. Banks*, CV478–138, was then filed asserting due process and equal protection claims as well as the state law claims. An additional claim concerning irregularities in the School Board voting districts was voluntarily dismissed by the plaintiffs before trial. While the case was pending here, the authority of the School Board to require the examination was upheld in the Georgia courts. The Georgia courts also found no equal protection violation in the fact that children in other counties were not subjected to the requirement. There were no black plaintiffs remaining in the case in this Court at time of trial. The case was restyled *Anderson v. Banks*. In addition, plaintiff's counsel adopted in his proposed pretrial order the outline of legal issues set forth by plaintiff's counsel in *Johnson v. Sikes*, thus further narrowing the scope of issues in this case to the due process claim. Since *Anderson v. Banks* is a suit for damages, it was agreed among all

counsel and the Court that liability only would be tried presently and a separate trial on the issue of damages would be held later if necessary.

2. The second action here consolidated for trial was filed in October, 1979, by Kathy Norris Johnson. In October, 1979, she moved to proceed *in forma pauperis* and to consolidate her case with *Wells v. Banks.* The motions were granted. The Court certified the following classes:

1. All black children who have attended, are attending, or will attend public schools in Tattnall County, Georgia, and who have completed, will complete, or are eligible to complete all valid and legal requirements for receipt of a high school diploma established by Defendant Board of the Georgia State Board of Education, but who did not or will not achieve a particular score on the California Achievement Test, and who, as a result of having failed to achieve a certain score on said test, have been or will be denied a high school diploma by Defendants.

1.a. All black children who have attended, are attending, or will attend public schools in Tattnall County, Georgia; and who have completed, or will complete all requirements for receipt of a high school diploma established by Defendant Board or the Georgia State Board of Education, other than achieving a particular score on the California Achievement Test, and who, solely as a result of having failed to achieve a certain score on said test, have been or will be denied a high school diploma by Defendants.

2. All children who have attended, are attending, or will attend public schools in Tattnall County, Georgia, who have been or will be classified by the Tattnall County School District or Board as Educable Mentally Retarded, and who have been or will be foreclosed from receiving a high school diploma by Defendants because of said classification.

The issues in the *Johnson* case are as follows: (1) whether the exit exam violates the equal protection clause of the Fourteenth Amendment; (2) whether the diploma requirement is violative of due process; (3) whether the policy violates Title VI; (4) whether the policy violates 20 U.S.C. §§ 1703, 1706; and (5) whether the policy of excluding educably mentally retarded (EMR) students from the possibility of obtaining a diploma violates Section 504 of the Rehabilitation Act of 1973.

The case was brought to trial on August 7, 1980.

After a thorough analysis of the issues, the Court sent a copy of its proposed order to the parties for comment. The Court then reworked the order in light of these very helpful comments. The Court has been very cautious in this matter which is of vital importance to the educators of this state. The recent opinion in *Debra P. v. Turlington*, 644 F.2d 397 (M.D.Fla.1981), has caused the Court to reconsider major portions of its reasoning.

## II. *Jurisdiction*

This Court has jurisdiction pursuant to 28 U.S.C. § 1343(3) and (4) over plaintiff's claims asserted under the Fourteenth Amendment and 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*; the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Equal Educational Opportunities Act, 20 U.S.C. § 1701, *et seq.*, because each constitutional or statutory provision provides for the protection of equal or civil rights. Cases interpreting the Rehabilitation Act of 1973 have noted the strong similarities in statutory language and legislative history to civil rights legislation. *See University of Texas v. Camenisch*, 616 F.2d 127 (5th Cir. 1980), review granted, 449 U.S. 950, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980), vacated and remanded on other grounds, —— U.S. ——, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Jurisdiction over the Equal Opportunities Act claim is also found under 20 U.S.C. § 1708.

Defendants have strenuously argued that the plaintiffs' case is basically a challenge to an academic program and academic regulations, which, in the absence of a bad motive, are not subject to judicial scrutiny. As support they cite *Mahavongsanan v.*

*Hall*, 529 F.2d 448 (5th Cir. 1976). Yet in *Mahavongsanan* the Fifth Circuit ruled that plaintiff had no action on the merits of the case. The Court did review plaintiff's arguments and decided that no rights of the plaintiff had been violated. In underscoring the reluctance of the courts to review purely academic decisions, the Fifth Circuit did not suggest that the district court should have refused to hear the case at all because it concerned academic matters. A substantive rule of law rather than a jurisdictional rule is announced there. In addition, the diploma of a graduate student rather than a high school student was at stake. Arguably, a high school diploma represents a very different interest, in light of compulsory attendance laws and the realities of our society which would not be applicable to a graduate degree.

In addition, a large portion of plaintiffs' claims here rest on allegations of racial discrimination which, even in an academic setting, are clearly subject to judicial scrutiny. *See United States v. Gadsden County School System*, 572 F.2d 1049 (5th Cir. 1978). Insofar as the claims allege that particular statutes giving rise to private litigation have been violated the claims are clearly justiciable. Insofar as the due process claims are concerned, in the absence of a protectible liberty or property interest, defendants' argument may have some validity. In that case, plaintiffs fail on the merits. So while agreeing with defendants that, in general, purely academic decisions are not within the province of the judiciary, as a threshold consideration, discussion of this point adds little.

### III. *Historical Background*

#### A. *Tattnall County*

Evidence was submitted concerning the history of race relations in Tattnall County and the sociological makeup of the area. The Court admitted evidence of this nature for the purpose of the determination of whether discriminatory intent played a role in the implementation of the exit exam policy and for the purpose of evaluating the Board's prior efforts in desegregating the schools. However, the Court is also mindful that for the most part the social and racial history of Tattnall County is a history shared with all of the South and standing alone sheds limited light on these recent events.

Tattnall County is located in the coastal area of Georgia. In 1970, its population of 16,557 was 30.8% black. While the population of Tattnall County as a whole is poor with more than 35% having incomes below the poverty line, the black population is poorer according to the 1970 census. More than 64% of the blacks had incomes below the poverty line. Median income for blacks lags behind that of whites. This state of affairs is not peculiar to Tattnall County.

#### B. *The School System*

The Tattnall County Board of Education is an elected body which conducts the business of the Tattnall County School District. The superintendent is Ben F. Sikes who is also elected. Mr. Sikes was superintendent at the time the Tattnall County School District abolished separate schools for whites and blacks in the 1970–1971 school year and has held that post to the present.

The Tattnall County Board of Education operates two high schools, Reidsville High School and Glennville High School. These schools are located in the towns whose names they bear. Reidsville is also the location of Tattnall Elementary School which contains classes from kindergarten through sixth grade. Two additional schools are located in Glennville. These are Seckinger Primary School, housing grades kindergarten through fourth grade, and Glennville Middle School which contains grades five through eight. A third primary school is located in Collins, the Collins Junior High School, which, despite its name, houses grades kindergarten through eight. The Tattnall County School District also operates the Ben Sikes School which is a separate school for the trainable mentally retarded students.

#### C. *The History of Segregation in Tattnall County*

Plaintiffs introduced evidence to illustrate that racial prejudice was pervasive in

Tattnall County prior to and at the time when the Tattnall County School District abolished the dual system. For example, newspaper clippings did indicate a less than substantial dedication to the equality of the races. However, such items are only marginally helpful in assessing the conduct of the School Board in implementing the exit exam policy fifteen years later.

The emergence of Tattnall County into the era of integration was not an easy transition. The schools were totally segregated until 1965 when the School Board agreed to introduce a Freedom of Choice program. Four black students applied for admission to the all-white high schools. These were Gail Strong, Roxie Ann Smiley, Johnny Harrison, and Ronald Johnson. At the School Board meeting which took place on September 7, 1965, directly before the plan was to be implemented, the principals were asked to talk to their students and explain "the situation they are facing, stressing the fact that there will be no preferential treatment for any child." School Board Minutes, Plaintiffs' Exhibit 58.

One of these students, now Mrs. Gail Strong Small, testified that she believed that she and her friend Roxie had been chosen to be the ones to integrate the all-white high school. Mrs. Small had graduated from Collins Elementary in 1962, a black school that was closed in 1970 when the dual system was abolished because it was substandard. Mrs. Small was attending Tattnall Industrial High, the all-black high school at the time of her decision. However, she was induced to change her mind about changing schools. She and her friend were informed at a meeting at Collins High School that because their scholastic training had been so inferior, they would have to be put back a year, or perhaps two, even though Mrs. Small was an honor student at Tattnall Industrial High School. The students decided to remain in the black school.

Mrs. Small testified that during this period she was subjected to harassing phone calls and that strangers shot at her house.

Miss Ophelia McIntosh testified to the condition of Collins Elementary School throughout this period. Classes were crowded with 40 to 60 children in a classroom. The books were old and written in. There were never any maps or other teaching aids. Mrs. Small testified to the poor plumbing facilities and the lack of playground facilities.

Another black child who attempted to attend a white school under the Freedom of Choice plan was Ronald Johnson. His father testified that during the period when Ronald attended a white school under the Freedom of Choice plan shots were fired into the house from passing cars. Harassment culminated in the burning of the Johnson's barn which destroyed their livestock. The Federal Bureau of Investigation began investigation and the harassment ceased. Ronald Johnson spent only that school year in the white school.

The dual system remained intact in the 1966–1967 school year. On January 20, 1967, the Board voted to forego federal funds rather than integrate the schools. On May 11, 1967, Tattnall County was found to be in violation of Title VI and federal funds were cut off. There were no federal funds received by Tattnall County in the 1968–1969 school year.

Ben Sikes, the present superintendent of schools in Tattnall County, was first elected to his post in 1968 after having been principal of Glennville Middle School for five years. He was superintendent at the time the dual system was abolished. The final impetus for the abolition of the dual system came from a court order. The Georgia Department of Education was under court order to withhold state school funds to any district which had not submitted its desegregation plan. The letter sent by the Board of Education to the citizenry, dated July 14, 1970, clearly spells out that the reasons for integration were financial. The 1970–71 academic year was the first in which blacks and whites attended the same schools. In the reorganization, Collins Elementary School, the formerly all-black elementary school, was closed as substandard.

Mr. Sikes testified that once the decision had been made, he attempted to implement the plan in a positive manner. He called a meeting of all the teachers and informed them that the dual system was at an end and that anyone who felt unable to work in the integrated system "had better go elsewhere." A university course designed to ease the transition to the unitary system was offered locally but, except for the administrators, few attended. As a measure to aid in the transition to an integrated system, summer school for Title I children was held in the summers of 1970 and 1971. Both blacks and whites attended this program which was financed through Title I funds. Several hundred children attended.

However, Superintendent Sikes' files contained minutes of a meeting with the principals on January 19, 1970, the winter preceding integration. According to the minutes, the principals were informed that attendance laws would not be as important in the biracial schools as they were in the dual system. At that same meeting, according to the minutes, it was suggested that two separate tracks be initiated—one for college-bound students and the other for non-college bound students.[1]

Even after the abolition of the dual system, the bus transportation to Reidsville High School from Collins, Georgia continues to be racially segregated. Two buses driven by black drivers transport the black students while two buses driven by white drivers transport the white students. Paul Walden, a black student at Reidsville High School, testified that Mr. Rhodes, the principal of Collins Junior High, had instructed the students that they were to ride a bus containing students of their own race. Buses carrying students to extracurricular activities are not segregated.

Except for the programs discussed above, no special effort was made to insure that the establishment of integration in the schools would be successful. The black students who had attended the substandard black schools were incorporated into the schools without any effort at that time to provide remediation.

Dr. Spencer, plaintiff's expert on child psychology and development, testified that it would be very difficult for a child to overcome his early training in a substandard segregated school. In addition, if a child perceives himself as inferior and a low achiever, he tends to divorce himself and his energies from the source of the unpleasant information. Thus, as Dr. Spencer testified, if a child is exposed to those who believe black is inferior or if he is exposed to those who brand him as a low achiever, he is likely to protect his self esteem by ignoring the source. Here, the black children attended inferior schools before they were permitted to attend integrated schools. Both factors worked against the black children and tended to retard their achievement. They had received a poorer education in the segregated schools and they were perceived by themselves and others as inferior. A possible example of this phenomenon is Kathy Johnson, a named plaintiff in the litigation, who had a non-verbal IQ score which fell from 112 to 58 during her school career in Tattnall County.

### D. *The Tracking System*

While a remedial program for the black students was not instituted, a tracking system was adopted in 1970–1971 school year. Defendants characterized this grouping as by achievement rather than by ability but as plaintiff's expert, Mrs. Bryan, testified, the distinction between achievement grouping and ability grouping is an illusory one since it is impossible to measure raw ability.

Tracking was employed in the elementary and junior high schools with the exception of Collins Junior High School which employed heterogenous grouping. The tracking system often resulted in racially identifiable classrooms. For example, at Seckinger Elementary School in 1971, while the first grade classes were equally proportioned, the second grade includes a 100% white class, a 100% black class, and an identifiably white class. The Fourth grade

1. This two-track system was not implemented.

which consisted of five classes included all white classes and two predominantly black classrooms. In 1972, almost half of twenty-four classes significantly departed from the one-third black, two-thirds white makeup which one might expect. Racially identifiable classes persisted at Seckinger until 1979–1980 when the school system abandoned its tracking system as a result of an investigation by the Office of Civil Rights. Similar patterns consisting of a large number of racially identifiable classrooms occurred in the other Tattnall County schools which employed the tracking system.[2]

Mr. Sikes testified that it was not intended that the black children be placed in the lower tracks—it simply turned out to be the case. That a disproportionate number of blacks were enrolled in the slower moving classes is even more surprising in light of the IQ data which came to light during the litigation. In examining the files of the students who have had to meet the CAT requirement in order to graduate, it was discovered that some files contained IQ scores from 1968–1969. There were 137 scores in the files. Ninety-five of the scores were for white children. Defendants strenuously objected to the use of these scores as a basis for any conclusions in the case on the grounds that the test given was a group test and was therefore unreliable and on the basis that there was no way to judge whether the sample composed of the students for whom early IQ scores are available is representative of the population of students who were subjected to the CAT requirement in order to graduate.

Ms. Driver, a psychometrist employed by the Tattnall County School District, testified that she did not believe that group scores were reliable and would make no decisions based on group scores. Dr. Leon Hurley, plaintiff's expert, testified that while he agreed that the placement of an individual child should never be based on an IQ obtained from group testing, his opinion was that the scores were reliable for the group. He also testified that an individual child was likely to do better in an individual testing situation than in a group testing situation. The Court agrees with Dr. Hurley that the group scores are reliable on a group basis.

The problem of the representativeness of the sample for whom IQ scores were available presents a more difficult problem. The number of children for whom scores were available, according to plaintiffs' statistical expert, Mr. Cole, was numerous enough for meaningful statistical analyses to be performed on the data. But the fact that the data are numerous enough does not necessarily indicate that the data are also representative. However, support for their representativeness comes from the data themselves. When the individual IQ scores were plotted, they were normally distributed with a mean of 102, almost exactly duplicating the distribution in the general population. Before the Court, then, is the situation in which the distribution of scores for the 137 students whose files contained early IQ scores is known. The scores of the 137 students appear to be representative of the scores of the general population. If the 137 scores are *not* representative, then the early IQ scores of all the students who had been subjected to the CAT graduation requirement are *not* similar to the scores of the population at large. Instead of believing that the missing scores differ from both those of the entire population and the Tattnall County students for whom scores are available, it is more likely that the scores which are available are representative of those of the group scores which are missing.

Analysis of these early IQ scores according to Mr. Cole and Mr. Huberty, defendant's expert on statistics, demonstrated that race and IQ were not related. The Court therefore concludes that the black and white children who were later subjected to the CAT diploma requirement began their academic careers with generally equal abilities.

In view of this fact, the disproportionate number of black children in the lower

2. Charts giving the exact racial percentages in each school in the years during which the tracking system was in force are attached as Appendix A.

groups is difficult to justify. Mr. Sikes testified that children were not placed in the lower tracks by IQ scores. Achievement, not ability, was the criterion used for placement according to Mr. Sikes.

However, even ignoring the difficulty discussed above of distinguishing meaningfully between achievement and ability, it appears that the black students in Tattnall County have not been placed fairly according to any objective criterion. The Court here relies on the factual findings of the Office for Civil Rights (OCR) based on its investigation of student class assignments conducted December 10–13, 1979, after a complaint had been filed alleging that the grouping practices violated Title VI of the Civil Rights Act of 1964. Defendants' present tracking policies were implemented in the 1972–1973 school year. Before integration was implemented, achievement grouping was not practiced. The primary determinant for placement of children entering the first grade is the Scott Foresman Initial Placement Score. Possible scores range from 0 to 57. Teacher judgment also plays a heavy role in placement. The CAT given to the kindergarten children in the eighth month of their kindergarten year plays a role primarily in the placement of borderline cases. The children were placed in one group for all subjects.

OCR found that black students were over-represented in the lower achievement groups and under-represented in the higher groups. This occurred in many cases despite rather than because of the scores achieved by the children.[3] There were no absolute cutoffs for particular groups and the over-lap worked to the disadvantage of the black students. At Seckinger Elementary there were many examples of black children who had been placed in lower groups than white children who had the same scores. Black children were placed as many as three classes below their white counterparts with the same scores. At Tattnall Elementary School, first graders were placed by adding their Scott Foresman scores to their CAT scores. However, the only use which was made of the composite scores was to make an absolute cutoff to determine the A and B groups. Those falling below the cutoff were placed in C, D, and E groups essentially without additional regard to their abilities. These grouping practices at Tattnall Elementary resulted in racially identifiable classrooms on the first grade level and the pattern of racially identifiable classrooms continued in each grade.

The tracking system as employed moved the lower groups through the same material which was utilized for the high achievement groups. No particular remediation or enrichment was offered. Students were promoted on the basis of their chronological age rather than their having successfully completed the requirements for a particular grade.

Plaintiffs bolstered their attack on the tracking system with statistical evidence. Two types of statistical analysis were used throughout the trial. The first type of analysis compares the actual distribution of data with its expected distribution. A chi square is the term used to describe the analysis of two variables, each of which is divisible into two mutually exclusive categories. A particular combination of these variables is compared to the expected value. A distribution is considered statistically significant if it would occur no more than five times out of one hundred. This .05 is the level of statistical significance. The second type of analysis is the correlation or linear regression. This analysis seeks to determine the existence of a relationship between two continuous variables or between one continuous variable and two mutually exclusive categories. This relationship is expressed by "Pearson r." Pearson r measures the strength of a relationship. If the value of Pearson r is squared ("r squared"), the resulting figure indicates the extent to

---

3. Specifically, OCR found that the scores overlapped as follows:

| Achievement Group | Range of Reading Scores |
| --- | --- |
| 1A | 45 – 57 |
| 1B | 37 – 56 |
| 1C | 40 – 50 |
| 1D | 24 – 49 |
| 1E | 30 – 45 |

which one variable is dependent on or can be predicted by the other variable. Another way of expressing this type of relationship is the probability or "P value." In order to be statistically significant, the P value must be less than .05; in other words, in order to be considered statistically significant, the relationship can be expected to occur by chance fewer than five out of 100 times.

Plaintiffs determined for each child for whom an early IQ score was available, the "race percent average." This figure was obtained by figuring the percentage of black children in a particular student's classes each year after the dual system was abolished and then averaging these figures. Dr. Huberty, defendant's expert on statistics, at one point in his testimony, strongly disagreed that race percent average was a proper variable because it lacked independence. Dr. Huberty argued that since all of the children in a particular class would share the same percentage for that year, the final figures for the race percent average would not be independent—many children would necessarily share the same numbers. Dr. Shapiro, plaintiff's expert, disagreed that the data were not independent and argued that if Dr. Huberty was correct, the data for race percent average when plotted should line up in columns. When Dr. Shapiro plotted the coordinates, the data were scattered. Thus, the Court concludes that race percent average is an appropriate variable for use in their correlation studies.

Plaintiffs' experts determined the correlation between the early IQ scores and race percent average for blacks and whites. The results support the inference that the black children were not placed according to their abilities while the white children were. For white students there was a significant negative correlation between their early IQ scores and being in a predominantly black class. In other words, for white children, the higher their early IQ scores, the fewer black children were likely to be in the same classroom. The actual data respecting this comparison were likely to occur by chance fewer than once in a thousand instances. However, for black children, the correlation between early IQ scores and being in a predominantly black class was not significant.[4] Thus, even if one posited a generally lower level of intelligence for the black children, an assumption which the evidence in no way supports, one would expect that high IQ black children would have fewer black students in their classes. But the correlations run on the actual figures support the conclusion that, while early IQ scores were not correlated to race, black children were placed disproportionately in the lower levels, placements which were not supported by early IQ scores or the achievement tests administered.

Achievement grouping was not attempted at Collins Junior High which used a system of stratified homogenous grouping. Since two of the elementary schools in Tattnall County, Seckinger and Tattnall Elementary, profess to group by achievement levels, a comparison can be made between the performance of the students who were grouped and the performance of those who were not grouped. Two objective bases of comparison exist in the Georgia Criterion Reference Test and the CAT.

A criterion referenced test is one which tests specific skills which the students presumably have been taught. Such a test differs from a norm referenced test. A norm referenced test compares the performance of the test taker to the performance of the test-taking population. The score is essentially a relative one. An individual score on a norm referenced test indicates how *overall* performance compares to that of the group on which the test was normed. The score does not indicate what particular skills are possessed by the student. A criterion referenced test indicates which specific skills have been mastered by

4. Dr. Shapiro testified that the results of the correlations were changed only marginally by ignoring the student's *own* race. The significant negative correlation between IQ and race percent average for whites and the lack of significant correlation between IQ and race percent average for blacks held true.

the test taker. While a criterion referenced test tells only the skills which have been mastered, obviously these results can be compared between schools or between school districts.

The Georgia Criterion Reference Test (CRT) is given to many Georgia school children every year. This test is constructed to evaluate students' mastery of particular concepts appropriate to the students' particular level. Plaintiffs submitted CRT results for eighth graders in Tattnall County. Illustrated by means of bar graphs, plaintiffs' exhibits compared the average results achieved in 1977, 1978, and 1979 by the eighth graders in three schools; Collins Junior High, the non-tracked elementary and junior high school; Glennville Middle School, the tracked middle school which is fed by Seckinger Elementary, also tracked; and Reidsville High School which is fed by Tattnall Elementary School which is tracked. In the mathematics sections of the CRT in the category of sets, in 1977, the three schools scored closely together with Reidsville slightly ahead of Collins which was slightly ahead of Glennville. However, in 1978 and 1979 Collins was dramatically ahead. In operations, Collins was well ahead for all three years. In measurements, Collins was ahead in all three years. In probability and statistics, Reidsville was slightly ahead of Collins in 1977 but Collins was the leader in 1978 and 1979. In relations and functions, Reidsville was slightly ahead in 1977, Collins was ahead in 1978 and 1979. In geometry Collins was dramatically ahead in all three years. See Plaintiffs' Exhibit 122.

The reading areas of the CRT appear to reflect similar results for the eighth graders in the three schools. In word recognition, Reidsville High was slightly ahead of Collins in 1977, but Collins was dramatically ahead in 1978 and 1979. In comprehension, Collins was well ahead in all three years. In language usage, Collins was ahead in all three years. In study, Collins was dramatically ahead for all three years.

Defendants did not contradict the above stated evidence but attempted to refute the inference that students learned more efficiently when they were not grouped by achievement by submitting additional evidence. One such item of evidence was the drop in scores of the eighth graders at Collins in 1980 when a new edition of the CRT was introduced.

In addition, students at Collins are using a different curriculum based on different teaching materials. Defendants introduced comparative scores made on the CRT for second and third grade students in 1979 and 1980. The pattern apparent in the scores for both the reading and mathematics sections is that the second graders at Collins do relatively poorly on the CRT while third graders at Collins do very well. The suggested explanation of this discrepancy in the scores of the Collins students offered by plaintiffs was that the different curriculum used by Collins introduced particular concepts at different times than the curriculum used at the other two schools. This explanation makes a great deal of sense.

Although the eighth grade figures appear to support strongly the premise that the non-tracked children out-perform the tracked children, the sixth grade CRT scores apparently demonstrate the opposite. The Collins students performed poorly.

Mr. Akins, principal of Tattnall Elementary School, performed research and came up with some interesting figures. Reidsville High School graduates students from both the non-grouped Collins Junior High line and the grouped Tattnall Elementary line. He determined that more black students who had progressed through tracked programs achieved 9.0 on the CAT. The precise figures for black students meeting the CAT requirement were as follows:

1980—80.5% of tracked, 66.7% of non-tracked;

1979—81.8% of tracked, 63.6% of non-tracked;

1978—77.8% of tracked, 66.7% of non-tracked.

On the basis of all the evidence recited on the merits and non-merits of achievement grouping, I am unable to reach any firm conclusion on whether such grouping is ben-

eficial. The strong showings of the Collins third graders and eighth graders on the CRT appear to demonstrate the benefits of non-grouping and the sixth grade scores and experience of ex-Collins students in passing the CAT appear to show otherwise. The differences in the curriculum used at Collins further cloud the question. Throughout the comparisons, Seckinger, at which achievement grouping is practiced, generally performed poorly, and more significantly, not similarly to Tattnall Elementary where achievement grouping was also practiced. Tattnall County operates only three elementary schools. Since the non-tracked school also uses a different curriculum, I find it impossible to accurately evaluate the effects of achievement grouping. In addition, since children were not grouped in a fair manner, it is difficult to reach any conclusion on the operation of a fairly administered tracking system. I see no basis, however, for concluding that achievement grouping as practiced in Tattnall County has obvious benefits.

## IV. *The Test*

### A. *Its Inception*

The diploma requirement in Tattnall County that each graduating student must perform at ninth grade level in the mathematics and reading portions of the California Achievement test was first conceived by Mr. Akins, principal of Tattnall Elementary School, and Mr. Russell, principal of Reidsville High School, on an automobile trip. They were concerned that some of the schools in Tattnall County were considered substandard by the State of Georgia. At that time, there was no formal existing procedure to identify those who were not performing at grade level in high school. No remedial programs existed and there was no method of requiring students to enroll in particular courses in high school to improve their basic skills. Mr. Akins and Mr. Russell passed their idea concerning competency testing onto other teachers and the idea was eventually presented to Superintendent Sikes and the School Board. The School Board adopted the policy in Spring, 1976, but did not impose the diploma sanction until Spring, 1978. Previous to the implementation of the CAT requirement, receipt of a diploma had been conditioned on successful completion of a certain number of credit hours and sufficient attendance.

Superintendent Sikes and the School Board did not perform some of the preliminary steps suggested as appropriate by plaintiffs. They did not examine the Technical Bulletin published by CTB McGraw-Hill, the test publishers. They did not perform a local validation of the CAT. They did not specifically address the effect that the CAT would have on students in the lower tracks or students who had previously attended all-black schools. However, Superintendent Sikes testified that he did look up the test in the Mental Measurement Yearbook, the authoritative source on testing according to plaintiffs' expert on testing, Mrs. Bryan. That source gave a favorable review to the 1970 edition, including a favorable review by Mrs. Bryan.

When questioned about the choice of test, Superintendent Sikes testified that the CAT was chosen because the school district had had good experience with the test. A norm referenced test was chosen rather than, for example, a particular score on the CRT, because the Board wanted to graduate students who compared favorably to national achievement levels. It was felt that in light of the mobility of contemporary society, the school system should prepare its graduates to compete on a national scale. The school system had had success with its Title I programs. By administering the CAT during the high school years, students who needed remedial help could be identified and required to attend remedial classes in reading or math as indicated. By employing the diploma sanction, the Board and administration hoped to spark student motivation in both the sense that consequences attached to failure to achieve and that the diploma, for the first time in years, would meaningfully represent a particular level of achievement. Mrs. Bradley, head of the math department at Reidsville, testified that she and others believed that part

of the students' poor achievement was due to an overwhelming lack of motivation on the part of the students.

Although Mr. Sikes testified that he did not expect that every student would pass the CAT and acquire a diploma, there was no evidence that the policy was adopted with racial intent. There was no evidence that defendants actually foresaw that the policy would work to the disadvantage of the black students. The testimony of the School Board members was that the policy was intended to improve student performance and not to discriminate in any way. The Court agrees with plaintiffs in that had the Board and administration directed their attention to the possible racial impact of the policy, it would have been apparent that considering the history of the dual system in Tattnall County, a disproportionate number of blacks would be denied diplomas.

Thus, the policy adopting the CAT diploma requirement and establishment of remedial classes was accepted by the School Board in 1976 although implementation was deferred. Evidence was conflicting on when students and parents were officially notified of the new policy. Loretta Wilcox, a named plaintiff who was a member of the class of 1978 who failed to meet the CAT requirements, testified that she found out about the requirement when she was in the eleventh grade. James Farmer who failed the CAT twice testified that he found out about the CAT requirement by overhearing a conversation when he was in the eleventh grade. However, Mr. Akins testified that the students were informed at the end of the 1975–1976 school year. This testimony was corroborated by Mr. Greg Moran, assistant principal at Reidsville High School. The Court credits the testimony presented by defendants that parents and students were specifically notified. It is incredible that the School Board would adopt a policy of such importance and fail to notify the parents and students. It is more likely that a particular family might not recall the letter or misplace it. However, the notification still occurred only two years before the diploma sanction was imposed.

### B. *Its Implementation*

Testing of students was begun at the beginning of the 1976–1977 school year. Remedial classes were established for those who failed to achieve 9.0. The same procedure was employed at the beginning of the 1977–1978 school year. The 9.0 requirement was applied to the class of 1978 and thirty students, out of a class of 219, received a certificate of attendance instead of a diploma as a result of the imposition of the requirement. Seventeen of those who received a certificate were black. In the graduating class of 1979, twelve students, out of 192, received a certificate of attendance for failing to meet the CAT requirement. Ten of these were black. In 1980, six students, out of 192, received a certificate of attendance due to failure to pass the CAT. All six were black.

The graduating class of 1978 was exposed only to the 1970 edition of the CAT. In the 1978–1979 school year, the school system switched to the 1977 edition of the CAT, Form C & D. This test is currently used in the school system.

Students who fail to achieve 9.0 on the CAT by graduation are permitted to retake the CAT and to enroll in further course work if they wish.

### C. *The Racial Impact of the CAT Requirement*

The evidence was overwhelming and essentially uncontradicted that the CAT requirement had a disproportionate impact on the black students in Tattnall County. Mr. Cole, who was qualified as an expert in statistics, testified about the methods employed by a statistician in order to determine whether or not certain data can occur by chance. The statistician begins by positing that no relationship exists between the two variables. The actual values are then compared to the data which could be expected if there were no relationship between the variables. The chi square is used to measure proportionality for two sets of non-overlapping data. For example, a chi square analysis would be appropriate if one

were checking to determine whether there was a relationship between religious belief and political affiliation by constructing a square with four cells, one for Catholic/Democrat, one for Catholic/Republican, one for Protestant/Democrat, and one for Protestant/Republican. These actual values would be compared to what would be expected in the absence of any relationship. It is agreed that a value of 3.841 for chi square is the level of statistical significance.

The probability value tells the likelihood of the occurrence in the absence of a relationship. The level of significance is .05, which means that a result is significant if it can be expected to occur by chance five times or less out of every hundred instances. Any value equal to or less than .05 demonstrates statistical significance according to established statistical convention. The standard deviation is a measure of the dispersion of data from the mean. The measure of standard deviation is significant at between two and three standard deviations.

Dr. Cole, a statistical expert, testified for plaintiffs. According to his calculations, the statistical analyses of the racial differences in receiving or failure to meet the CAT requirement are as follows:

| Year | Chi Squared | P. Value | Standard Deviation |
|------|-------------|----------|--------------------|
| 1978 | 12.223 | .0005 | 3.496 |
| 1979 | 24.697 | .0000 | 4.970 |
| 1980 | 15.474 | .0001 | 3.934 |
| 1978-80 | 49.020 | .0000 | 7.001 |

The significant racial impact of the CAT requirement is obvious.

Mr. Cole also performed correlation studies on the data. A correlation study, as opposed to those statistical analyses which detect the existence of a relationship, measures the strength of the relationship between two variables. For the purpose of the analyses contained in plaintiffs' Exhibit 91, "education" denotes the receipt of a diploma. A strong correlation, as noted above, existed between race percent average and meeting the graduation requirement, the more blacks in a student's classes, the less likely he was to meet the requirement. In addition, for whites, the early IQ scores were positively related (.3541) to success on the CAT. For blacks, there was no significant relationship (.1039) between early IQ scores and success on the CAT—and what slight relationship appeared was in a negative direction for blacks. Those with higher IQ's were slightly *less* likely to perform well on the CAT.

A multiple regression analysis was also performed by plaintiffs. A multiple regression analysis makes use of the Pearson or correlation coefficient to analyze the roles played by several variables in an attempt to explain a particular phenomenon. The variables are regressed, that is, considered in order of statistical importance. The $r^2$ is the percentage of the phenomenon accounted for by a particular variable. As the variables are regressed in order of statistical importance, the change in the $\%r$ represents only that amount of variance attributed solely to the newly regressed variable.

Plaintiffs' expert performed such an analysis correlating High CAT Reading and High CAT Math [5] with race percent average, early IQ scores, special education placement and race. Race percent average, the average of the percent of black children in a student's class from the third to eighth grades, was the most potent predictor of CAT scores. The r squared for race percent average and High CAT reading was .48636.

5. These terms mean a student's highest score on the CAT reading or math sections. The scores also reflect corrections made necessary by mistakes in grading.

This means that the racial composition of a student's classroom alone accounted for 48% of the variance in scores on the CAT reading section between blacks and whites. Race percent average accounted for 33% of the variance between whites and blacks on the math portion of the CAT.

The Court finds these figures fairly remarkable in that of all the universe of possible influences race percent average is such a potent predictor. Of course, these figures do not necessarily indicate a causal relationship. They do indicate a high correlation.

The effect of the racial composition of the classroom on CAT scores is especially remarkable in light of the early IQ scores of the students. Those scores accounted for only 1.4% of the variance in the reading section and .5% of the variance in the math section for the black students. Nor can the IQ factor be perceived as subsumed in the race percent average figure since IQ was not related to placement for blacks. Since, as discussed above, placement for blacks was not carried out on an acceptable, consistent rationale and blacks were often placed in spite of rather than because of their achievement scores, the fact that race percent average can account for such a large portion of the variance is remarkable.

### D. The CAT Itself

The California Achievement Test is a norm referenced test of achievement in reading and math. National norm-referencing means that by testing a large random sample of students and determining what the normal level of achievement is, a basis for comparison is established so that an individual's scores can be compared to his peers' across the nation.

CTB McGraw-Hill used a stratified random sampling procedure in test development. First, examples of curriculum were solicited from state boards of education and many school districts across the country. Then experts are asked to develop test items after studying the curricular objectives obtained. The test is tried out in a pretest on a group which is not as large as the group used for norming purposes. After the pretest, item analyses are performed. The item analyses include checking for item validity. The concept of item validity is discussed more fully below. The test is then standardized on a large stratified random sample of students. School districts are identified as urban, small, etc. and each region of the country is represented. Within these established strata, groups of students are selected randomly. This method insures that school systems representative of the types of systems existing in the country are represented in the norming group. Although there were no Georgia students included in the 1977 norming groups, students in the Southeast were well represented. For the 1970 edition, 203,684 students from 36 states participated in the standardization. Approximately 200,000 students were involved in the standardization process for the 1977 edition. After the standardization process, grade equivalency scores were calculated. Grade equivalency means the typical performance of a student in the standardization sample for that grade. Although the CAT was not given to the norming group in every month, the scores were extrapolated to give a grade equivalency score for each month. For example, the test might have been administered to the norming group in November and May. The grade equivalent scores for the third and ninth month would actually correspond to the typical performance of those in the norming sample. Steady progress was assumed, according to Ms. Bryan, in order to provide grade equivalency scores for those months in which the test was not actually administered to the norming group.

The methods of test construction for the 1970 and 1977 editions were similar. However, the 1977 edition was constructed with more attention to the elimination of bias in the test. The national norms for both editions included proportional representation of minority groups, but in preparing the 1977 edition, particular attention was paid to reviewing items for racial and ethnic bias.

Both editions of the CAT were well-received in the testing community and the 1970 edition received favorable reviews in the Mental Measurements Yearbook. Both tests were constructed in accord with the standards for educational and psychological testing developed by the American Psychological Association.

Further discussion of the test is aided by the understanding of some terms used in the testing field. The first of these is the standard error of measurement. The concept of the standard error of measurement reflects the fact that it is impossible to say with certainty that a particular score represents the exact achievement level of a particular student. The score instead is indicative of a range in which the student's real score falls. One can be, according to Ms. Bryan, 67% sure that the real score falls between one standard error of measurement above and one standard error of measurement below the observed score. One can be 96% sure that the actual score is between two standard errors of measurement below and two standard errors of measurement above the observed score. According to Dr. Findlay, defendant's expert on testing, the standard error of measurement is less important in the situation where the highest score only is of import and a student takes the test repeatedly, since he will not always fall in the lower part of his range.

"Validity" in the testing field indicates whether a test measures what it is supposed to measure. The degree of difficulty for a particular item is one relevant factor in assessing the validity of the test. The degree of difficulty is the percentage of children who answered the item correctly. If almost none or almost all of the children answer correctly the item is of little worth since it does not differentiate between the test takers. Ms. Bryan testified that an acceptable range of difficulty is from .20 to .90 with the mean on a multiple choice test of .60.

The point biserial is a measure of the validity of a particular item. It measures the relationship between success on a particular item to success on the test as a whole. The point biserial is used in the testing industry as a whole and by CTB McGraw-Hill in order to determine that validity. Ms. Bryan testified that, in her opinion, an item should be discarded if its point biserial is below .30. CTB McGraw-Hill uses .20 as its cutoff figure.

Bias in the test items affects the validity of the test. "Bias" as it is used in the testing industry means results do not have the same meaning for different groups. In other words, when an item or test is biased it is measuring different things for different groups. This concept is distinct from the possibility that one group may not achieve as well as another group.

Except as already noted, no serious attacks were raised by plaintiffs on the test construction and validation performed by CTB McGraw-Hill.

### E. The CAT in Tattnall County

Plaintiffs have taken the position that, while viewed alone the CAT is a respectable test instrument, the circumstances of its use in Tattnall County, even apart from problems created by historical racial discrimination, cause the test to be unreasonable and unrelated to any legitimate educational goal.

One of these objections to the use of the CAT in Tattnall County is that defendants have not taken into account the standard error of measurement when assessing a student's performance. Ms. Bryan testified that had one standard error of measurement been taken into account in evaluating their scores that at least eight students who were denied diplomas in 1978 and 1979 would have graduated. The Court is reluctant to place much weight on this particular factor since the School Board's policy might be described as requiring a slightly higher level of performance. The 9.0 points represent one standard error of measurement below the actual required score. In addition, since the CAT is administered to the students on several occasions, the Court credits the testimony of Dr. Findlay that the errors in measurement are reduced over

successive administrations. Thus, that the announced policy set the cutoff standard at 9.0 when, taking into account the standard error of measurement and the fact of repeated test administrations the actual cutoff point was slightly higher than 9.0, does not seem to be of much legal significance.

A second criticism of the CAT's use in Tattnall County is that no local validation study was performed. A validation study is not normally necessary before a standardized test is used by a local district since such a requirement would negate the reasons for selecting a norm referenced test in the first place. Dr. Shapiro testified that when a test is used for a purpose other than that for which it was designed, it should, according to APA guidelines, be revalidated locally. Mr. Donald Green and Mr. Robert Long, testing experts employed by CTB McGraw-Hill, both testified by deposition that the CAT had not been designed to be used as an exit examination. To some extent, the analysis depends on the definition of "exit exam." Mr. Sikes testified that the CAT was chosen in order to compare the achievement of students in Tattnall County to the achievement of students nationwide. Essentially, according to the testimony of Mr. Sikes, the CAT was employed for its usual function—to compare children to the norm group. It was this *comparison* which was then used to make decisions about the students; i. e., whether or not they would receive diplomas.

The local validation performed by plaintiffs in preparation for trial clearly demonstrates that the CAT did not perform as well in Tattnall County as it had on the groups selected by CTB McGraw-Hill. While, according to the testimony of Mr. Green, the CAT had been examined for bias by the publisher and biased items removed, the test was not free from bias when administered in Tattnall County.

CTB McGraw-Hill utilized a point biserial analysis to determine the existence of bias. The point biserial relates to the student's performance on the test as a whole or on a relevant subtest. A high point biserial—a strong relationship between doing well on an item and doing well on the test—indicates that the test is valid.

The specific standard utilized by the test publisher in rejecting items appears on page 141 of the Technical Manual for CAT 1977: Point biserials under .20 were considered unsatisfactory for either the "Black" or "other" group, and differences between the groups in excess of .20 were considered evidence of bias. Thus, the item was rejected if either group had a point biserial less than .20 or if the difference between the point biserials was greater than .20. Dr. Huberty, defendant's expert, had a different interpretation of the standard which the Court rejects in light of the plain language of the Technical Bulletin.

Plaintiff's expert, Dr. Shapiro, performed an item analysis on the performance of Tattnall County students on the CAT 1970 and CAT 1977. He defined bias and utilized the point biserial analysis as defined in the publisher's Technical Bulletin. He found that for students at Reidsville High School, 52.9% of the questions on the reading portion of the 1970 CAT and 69.4% of the questions on the math portion of the 1970 CAT were biased by CTB McGraw-Hill's standards. At Glennville, 62.4% of the questions on the reading portion and 62.2% of the math questions on the 1970 CAT were biased. In 1979, both schools used the same form of the CAT 77 and 60% of the questions on the reading portion and 45.9% of the questions on the math section were biased.

Examining the scores of the Tattnall County students only for validity, that is, point biserials equal to or greater than .20 for the items, many items do not appear to be valid. Plaintiffs' Exhibit 95 lists the point biserial calculated. At Reidsville in 1978, more than 50% of the items had biserials below .20. At Glennville in 1978, more than 44% of the items had unacceptably low point biserials. In 1979, almost 42% of the items had unacceptably low point biserials.

The Court is uneasy noting these facts. Plaintiffs' evidence on the bias and validation points was not successfully challenged at trial. Yet it is difficult to believe that

the results obtained in Tattnall County can be so different from those obtained by CTB McGraw-Hill. Ms. Bryan testified that there must be significant differences between the students in Tattnall County and the national sample. She did not elaborate on the possible explanation for such a phenomenon.

Plaintiffs also challenged the CAT graduation policy on grounds that the CAT did not test what was being taught in the Tattnall County schools. To some extent, plaintiffs appear to be arguing that an achievement test should not be used to determine who can be awarded a diploma. In arguing that a nearly exact correlation should exist between what the students were taught and the material included in the test, plaintiffs essentially assert that only a criterion referenced test would ever be appropriate as an exit examination.

Defendants' expert, Ms. Larson, an employee of CTB McGraw-Hill, was employed to demonstrate the relationship between the curriculum taught in Tattnall County and the CAT. Her results appear in Defendants' Exhibits 44 and 45. The Court places little weight on her results. She matched objectives in the curriculum, assuming use of the Scott-Foresman Series, to objectives purportedly tested by the CAT. She found that 91% of the Scott-Foresman math skills were tested by CAT 1970 and 71% of Scott-Foresman reading skills were tested by CAT 1970. Comparable results were obtained for CAT 1977 and the Scott-Foresman program. The High Intensity Learning Systems (HILS 2) which was used for students in the remedial classes fared less well as Ms. Larson testified. CAT 1977 tested 70.4% of the HILS 2 objectives and CAT 1970 tested 67.3%.

Ms. Larson did not limit her correlation to Level 19 of the CAT 1977 or Level 5 of CAT 1970, the actual tests used to determine receipt of a diploma. She included the objectives for all the levels of the CAT. Plaintiffs' point is well taken that lists of curriculum objectives and test objectives are not precisely defined and categories overlap to some extent. It would have been more helpful to establish generally that most of what was taught was tested by the CAT but, more importantly, that the questions posed on the CAT could be traced to the curriculum employed in Tattnall County. This was not done and would be a very difficult task. About a third of the students, those at Collins, do not use the Scott-Foresman curriculum *at all*. In addition, the Scott-Foresman program was phased in over years so that during some periods of their education, only portions of classes of 1978, 1979, and 1980 were exposed to the Scott-Foresman curriculum. Evidence on this point was vague.

Ms. Larson's testimony also assumes that the students were exposed to the full curriculum. Ms. Bradley, a math department head in Tattnall County, testified that some students in the remedial mathematics program do not complete the curriculum. Ms. Bryan testified that in the areas of geometry, algebra, and measurement that the students do less well—the same areas that are the last to be covered in the remedial program.

However, it is important to note that Ms. Bryan agreed that the type of questions covered on the CAT should be included in any standard recognized curriculum.

In addition to problems with the CAT, validation, bias, curricular correspondence, plaintiffs have brought a few additional disturbing matters to the Court's attention. One additional problem is the prevalence of misgrading the tests, which plaintiffs contend adds to the aura of arbitrariness of the policy as perceived by the students. The tests have been hand-scored in Tattnall County. Ms. Bryan testified that in the testing industry, scoring errors of no more than 3–4% are expected in hand-scoring. However, at Glennville High School in 1978, 58.44% of the math papers and 20% of the reading papers were scored incorrectly. In 1979, 10% of all papers were scored incorrectly. However, it is important to note that no errors in correcting resulted in denying a diploma to a student who qualified under the exit exam policy. Further, the Court is of the opinion that having had

these errors brought to their attention, the Tattnall County School Board will insure that errors of this dimension will not reoccur. There is no reason to believe that the errors were anything but inadvertent and may have been precipitated by the use of a stencil to go over answer sheets, which caused some items for which two answers were given to be marked correct.

A more disturbing problem was raised by plaintiffs as to the reliability of the test in Tattnall County. "Reliability" is that characteristic of a test which insures that comparable results will be obtained on a retest given shortly after the initial test. In addition, testimony was uncontradicted that for slower children, a gain of only one-half a year in achievement was expected. Yet the test results for some of the students were plainly bizarre. For example, defendants' Exhibit 52 shows CAT scores for 1978 Glennville seniors for the tenth, eleventh, and twelfth grade administrations of the test and the twelfth grade reexamination where necessary. Mickey A.'s reading score on the CAT in the tenth grade was 3.8. One year later the score was 8.0. At the time of his senior retest, his score had regressed to 4.1. Renwick F. went from a 4.3 in reading and 3.9 in math in the eleventh grade to 10.0 and 9.8 less than two years later. Darlene J., according to Defendants' Exhibit 53 which gives the respective figures for Reidsville, jumped from 3.3 in reading and 5.8 in math in the tenth grade to scores of 9.9 and 9.2 in the twelfth. Kennie K.'s scores improved from 2.8 in reading and 4.6 in math in the tenth grade to 9.0 and 9.5 on the twelfth grade retest. Vernie A. at Reidsville obtained the following reading scores: 4.9, ninth grade; 2.5, tenth grade; and a whopping 11.5 in the eleventh grade. Progress was not steady. According to Defendants' Exhibit 12 showing the gains by year for 1980 Reidsville seniors in the math section, Talmadge F. showed a gain of 5.0 in his freshman year's CAT score. His score deteriorated each year thereafter. The corresponding exhibit for Glennville, Exhibit 14, shows Ricky B., after having regressed .1 in the ninth grade, showed an incredible *gain* of more than 7 grade levels in his tenth grade math score.

Ms. Bryan testified that these variant results could be attributed to the test itself, to coaching or cheating, or to differences in student motivation. The Court was not convinced that the school personnel had been guilty of an impropriety in administering the tests and keeping them secure. Ms. Bryan suggested that the teachers had been "teaching to the test." Yet the Court agrees with Dr. Findlay that if teaching to the test means that the students were educated to be able to answer the *kinds* of items that appear on the CAT then the teachers are performing as they should. No serious criticisms of the CAT as constructed by CTB McGraw-Hill were advanced. Ms. Bryan opined that the group of students in Tattnall County varied significantly from the national norm group.

The Court is quite hesitant to assume that the students in Tattnall County are so deviant. A more obvious explanation is that some students were not performing up to potential on these tests and were motivated to apply themselves both to the test and to the remedial courses after the diploma policy was initiated. Other than motivational differences on different occasions, the Court can arrive at no sensible explanation of the varying test results.

## F. *The Benefits*

There can be little doubt that scores on the CAT in Tattnall County are improving. The number of non-retarded students who failed the CAT has decreased from thirty in 1978 to six in 1980. As discussed above, the CAT requirement still affects blacks disproportionately. All six of those who failed to graduate because of the CAT requirement in 1980 were black. Plaintiffs' expert, Dr. Spencer, agreed that educational progress was being made in Tattnall County.

Witnesses from the ranks of the teachers and administrators of the Tattnall County schools uniformly believed that the diploma policy was having a good effect in Tattnall County. Superintendent Sikes testified that he believed the policy was beneficial.

Ms. Ann Kennedy, a former teacher who is about to retire from her position of counselor, was of the opinion that the students were responding favorably to the responsibility which had been placed on them. Apparently, the CAT policy provides one of the few areas in which the student is forced to take some responsibility since it was generally agreed at trial that the Carnegie unit system had been so debased by the practice of social promotion as to be meaningless.

Phillip Russell, principal of Reidsville High School, testified that he believed that the students overwhelmingly supported the policy and that pride and morale were greater among the student body than before the policy was implemented. William Harrell, principal of Glennville High School, testified that he believed that the students' attitude in general had improved and that there were fewer fights and instances of tardiness. Betty Davis, a teacher, testified that she believed the students were reading more on their own and that they turned in better book reports. Ms. Bradley, a math department head, testified that, as more students become proficient in basic skills, they were electing more math courses. Although thirteen remedial math classes were necessary formerly, only six are needed currently.

Admittedly, the testimony of the school system's teachers is not as precise as some statistical comparisons might be, yet the Court finds the testimony of these teachers credible. Defendants bolstered these impressions with numbers indicating the progress that had been made. Defendants' Exhibits 38 and 39 demonstrate this progress. The increases shown by the graduating class of 1980 at Glennville High School showed a three-year increase of 3.7 in reading and 2.8 in math. The 1980 graduating class at Reidsville High School showed a 4.28 increase in reading scores and 2.55 increase in math scores over the same period. Although the gains for the graduating classes over the years were impressive, more impressive is the change which is, apparently, taking place throughout the system, including the pre-high school classes. While freshmen at Glennville in 1978 averaged 8.0 in reading and 8.7 in math, the Glennville freshmen in 1980 scored 8.4 and 9.6. At Reidsville, the freshmen of 1978 scored 7.59 in reading and 9.05 in math. The 1980 Reidsville freshmen were scoring 8.7 and 9.72. Since these gains occurred before the students were exposed to the high school remediation program, some progress must be ascribed to the diploma policy itself since it is more plausible that the threat of denial of a diploma to a teacher's students motivates both the teachers and students below the high school level to work harder on the basic skills.

Dr. Findlay testified that he believed the policy had been helpful to black students, even though the diploma sanction fell disproportionately on black students. He pointed out that only fourteen black students had passed the CAT requirement without the help of remedial classes while 112 had passed *with* remediation. He was of the opinion that the policy had been beneficial to blacks.

In addition to their argument that the remedial program which they do not attack, and not the diploma sanction, is responsible for the educational progress being made, Plaintiffs' Exhibit 121 compares the scores made by Tattnall County tenth grade students on the criterion reference test given by the State of Georgia to the average statewide scores for the years 1978, 1979, and 1980. The impression given by these graphs is that Tattnall County's performance is essentially unchanged and generally below the state average.

Specifically, in the reading comprehension section, Tattnall County showed, over the three years, gains on seven items, some of them slight, and no change on three items. For communication skills, Tattnall County showed gains on two items, losses on one, and no change on one. In writing, there were four gains, three losses, and no change on two items. In numbers systems, Tattnall County gained on four items and remained the same on one. In personal finances, Tattnall County gained on two,

lost on one, and remained the same on two. In probability and statistics, Tattnall County gained on two and remained the same on one. In relations/functions, Tattnall County gained on two. In measurement, Tattnall County had two gains and one loss. In geometry, Tattnall County had losses on two items and one remained the same. In problem solving, Tattnall County remained the same on three items.

The scores are generally favorable but not dramatic. These results do not reflect the dramatic increase shown in the CAT scores. However, the tenth grade scores were obtained before the students were fully exposed to Tattnall County's remedial programs. The Court does not conclude that these results obtained by tenth graders Georgia Criterion Reference indicate that the diploma policy does not have a good effect. The Court finds that the policy is producing some educational benefit in Tattnall County.

### V. *Special Placement*

The Tattnall County School District operates special education programs which are financed in part through Title VI–B of the Education of All Handicapped Children's Act of 1975. The School District assures the federal government that Section 504 of the Rehabilitation Act of 1973, as amended, will not be violated. The District in the operation and regulation of its special education programs utilizes the Rules and Regulations for Exceptional Children, promulgated by the State Board of Education. These standards are also found within the District's Annual Program Plan for Title VI–B funding.

The Court finds plaintiffs' expert on special placement, Dr. Leon Hurley, to be highly qualified and relies substantially on his testimony. Dr. Hurley was a Fulbright scholar who holds a Ph.D. from the University of Illinois in mental retardation. Mental retardation occurs when a child is significantly subaverage in intelligence and, at the same time, shows serious deficits in adaptive behavior, which is defined as his ability to cope with his environment. In deciding whether or not to classify a child

as retarded, his IQ must first be determined as within the range of mental retardation. Of the mentally retarded, the category with the highest level of functioning is the educable mentally retarded (EMR). To be placed in an EMR program, a student must have an IQ which registers between two and three standard deviations below the mean on the test utilized. The child placed in EMR classes should have an IQ between 55 and 69. To be classified as trainable mentally retarded (TMR), the next lower level of mental retardation, the tested IQ must be within the range from 55 to 30, which is more than three standard deviations below the mean. The Court agrees with Dr. Hurley that the regulations as they currently appear in the Georgia Department of Education's regulations do not allow for placement of children whose IQ's are "borderline," that is, above the cutoff scores.

To be included in the retarded range, a child must exhibit abnormalities in addition to his low IQ score. A child who adjusts well to his environment and who possesses good social skills should not be classified as mentally retarded, according to Dr. Hurley.

A specific learning disability (SLD) occurs when a child suffers from a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written. There is a discrepancy between an SLD child's intelligence and his performance in school. Some problems included in the SLD category are minimal brain dysfunction and dyslexia. An SLD student's poor achievement cannot be attributed to mental retardation. If a child of normal intelligence who suffers from a specific learning disability is not diagnosed properly, he may continue to fall behind academically and may eventually test in the retarded range.

The expected incidence of mental retardation nationwide is 2.3%. The evidence of specific learning disabilities can be expected to be about the same according to Dr. Hurley. Some environmental factors such as general health care, diet, and prenatal care can influence the incidence of mental retar-

dation. Biased evaluation procedures can also influence the incidence of special placement.

Tattnall County places a far larger percentage of its students in classes for the mentally retarded than is normal throughout the United States. In the 1977–78 school year, 7.07% of the student population in Tattnall County were classified as mentally retarded. The average percentage in the United States was 2.3%; the average in Georgia for that year was 3.31%. In 1978–1979, the Tattnall County School District placed 5.17% of the student population in classes for the mentally retarded. That year the average in Georgia was 2.3%.

Placement in a class for educable mentally retarded students is advantageous to those who are genuinely retarded. These students profit by the emphasis on social and vocational, rather than academic, skills. The students have potential for unskilled and some semi-skilled jobs. However, placement in the EMR program for a student who is not truly retarded is disastrous. Teacher and peer expectations are far lower for a child placed in EMR classes than for children in regular classrooms. Academic subjects are not emphasized and a child who has been misplaced in an EMR class will not be exposed to material necessary to achieve his potential. The longer the child is misclassified, the more severe and difficult to repair the damage caused by the misclassification becomes. In addition, a social stigma attaches to the children enrolled in the EMR classes. The EMR students may be called names by the other students. Other children may not be permitted to play with retarded children. It is clear that in an appropriate placement for a truly retarded child the benefits of EMR placement outweigh the problems associated with placement. For a child who is not retarded, misclassification is a disaster.

The procedures used for placing children in classes for the mentally retarded or the learning disabled are set out by state regulations. According to these regulations submitted to the Court as Plaintiffs' Exhibit 69, a child is first referred for evaluation. This referral is made usually by a teacher but a parent, judicial officer, social worker, or physician may request that the child be evaluated. Parents must consent to the evaluation and should be notified in advance of the placement committee meetings which they may attend.

Before any educational or psychological testing is performed, the student is tested for physical problems such as poor sight or hearing. Individual psychological tests are then performed. After this testing is completed, the student becomes the subject of a meeting of the Special Education Placement Committee which is to review all the available information and determine the appropriate program for that child. The committee is to consider *all* the pertinent data—not only the information developed specifically for the placement decision. Records are to be kept of the meeting so that one might examine the minutes and discover the basis for the decision. Before the student is placed in a special program, parental consent must be obtained. An individual educational program (IEP) is worked out and reviewed annually. The placement decision itself is reevaluated every three years.

These placement procedures were observed in the Tattnall County School District, according to the testimony of Ms. Driver, the psychometrist for the district. There were two glaring exceptions. In Tattnall County, the practice was to send a consent form to the parents before the evaluation was performed. No additional consent form was used. Perhaps even more importantly, minutes were not kept to reflect accurately the reasons put forth in the Placement Committee meeting supporting a recommendation that a student be classified as EMR. The explanation offered by Ms. Driver was that members of the Committee wished to speak freely and did not wish that their remarks regarding a particular student be recorded. This practice flies in the face of the regulation and its obvious rationale.

The pattern of placement produced in the Tattnall County School District evidenced

that a grossly disproportionate number of black children were classified as mentally retarded while the classes for children with specific learning disabilities were mostly white. The actual figures are as follows:

### 1976

| | EMR | LD |
|-------|-----|----|
| Black | 103 | 2 |
| White | 27 | 15 |

### 1977

| | EMR | LD |
|-------|-----|----|
| Black | 117 | 16 |
| White | 27 | 41 |

### 1978

| | EMR | LD |
|-------|-----|----|
| Black | 71 | 9 |
| White | 21 | 47 |

Mr. Cole testified that these figures were extreme and the possibility of their having occurred by chance was almost non-existent. The 1976 figures produced a probability value of 0.0000, and the Pearson Chi Square equalled 33.531 with the level of significance being 3.8. The data represented 5.791 standard deviations. For the 1977 data, the probability value was again 0.0000, the Pearson Chi Square 72.487, and the number of standard deviations 8.514. For the 1978 data, the probability value was again 0.0000, the Pearson Chi Square 52.-331, and the number of standard deviations 7.234. Obviously, placement procedures in the Tattnall County School District are having a severe racial impact.

The figures themselves give rise to the inference of misclassification. No tenable explanation of these figures was offered at trial by defendants. Although, as discussed above, the blacks in Tattnall County are generally poorer than the whites and plausibly eat less nutritious foods and may not enjoy adequate health care, it is difficult to find a causal relationship between the poorer position of blacks in Tattnall County and their overrepresentation in the EMR classes and underrepresentation in the LD classes. While a poor environment may possibly cause some increase in the incidence of mental retardation, it is difficult to understand how the same poor environment results in a greatly lowered incidence of learning disabilities. According to the testimony of Dr. Hurley, a non-treated learning disability may eventually result in a lowering of IQ scores. This fact does not explain the disparity in special placement for blacks and whites since the date of misdiagnosis is simply pushed into the past. Ms. Driver testified that when one of the named plaintiffs, Kathy Johnson, was in the primary grades, there were no programs for the learning disabled student. However, this phenomenon of untreated LD students slipping into the mentally retarded range of IQ scores should occur equally in the black and white student populations. Ms. Driver testified that some white parents refused to allow their children to be placed in EMR classes because of the predominance of black children in those classes. Of course, that a predominance of black children exists in the EMR classes is a problem not an answer, and this fact does nothing to explain why black children are underrepresented in the classes for the learning disabled. The inescapable conclusion is that some children are being misplaced.

This conclusion is buttressed by the figures set out in Plaintiffs' Exhibit 110. In 1976–1977, at which time the current regulations were in force with a cutoff score of 69 or 70, 26% of the students were classified as educable mentally retarded and had scores of 71 or above. Overclassification continued in the 1977–1978 and 1978–1979 school years. Ms. Driver explained that, in her view, the regulations had changed and that "borderline" cases were permitted at the time many of these students had been classified. Complete reevaluation is required every three years. But an opportunity to review so easy a matter as checking a recorded IQ score against the state regulation could easily be performed during the required annual check of the student's IEP. Such a check is particularly appropriate

when the serious effects of a misclassification are considered.

A complaint was made to the Office of Civil Rights (OCR) concerning special placement in the Tattnall County School District on February 14, 1980, by Kathy Johnson. Pursuant to this complaint, a team of OCR investigators visited Tattnall County. They randomly selected 39 students placed in EMR classes and examined their files. Thirty-one black and eight whites were included in the sample. The OCR team found that twenty-three of the thirty-one did not have adaptive behavior assessments. Seventeen of these were black. Eleven students did not fall within the correct IQ range. Five of the students who were missing adaptive behavior assessments also had IQ scores above 70. Two blacks were assigned to EMR classes in violation of both the adaptive behavior and IQ requirements. Twenty-three black students, in addition to these obviously misplaced two, did not satisfy EMR placement requirements.

Some individual records further document this pattern of misplacement. The school records of Kathy Johnson, a named plaintiff in this action, are an unsettling illustration of the tragedy of a child for whom the educational system has failed. When she was in the third grade, Kathy Johnson was given an IQ test. Her nonlanguage IQ was 111. Her total IQ was 98. The subtest scores were charted. She was above average generally except in her language subtest. She was severely below average in delayed recall. This sort of pattern, according to Dr. Hurley, is typical of children with learning disabilities. There is no doubt that Kathy Johnson was not retarded when she was in the third grade. There was evidence of many absences in the first grade and of some neglect. She did not learn well but was not diagnosed as a child in need of help. She was passed on. Her fifth grade report card indicates that while Kathy could understand what she was told and could express herself orally, she could not read, spell, or write. Nevertheless, she was passed. In the seventh grade, her grades did not reflect what must have been an abysmal state of achievement. She

passed every subject and received an 80 in English.

In the tenth grade, she was considered for special placement. At that time, she was performing six grades below her actual grade level. The evaluation was performed by the Cooperative Educational Service Agency (CESA) who contracted to perform testing services for the Tattnall County School District before their full-time psychometrist, Ms. Driver, was employed. As a matter of fact, Ms. Driver participated in some evaluations with CESA at that time. She performed the adaptive behavior assessment on Kathy Johnson.

Kathy Johnson's results on the Weschler Adult Intelligence Scale did not fall within the range of mental retardation. Her verbal IQ range was 72–83; her performance IQ range was 69–79; her full scale IQ range was 70–80. Thus, Kathy appears not to meet the IQ requirements. The adaptive behavior portion of her evaluation can only be described as outrageous. As discussed above, the adaptive behavior requirement is an important part of the placement process and a child who does not exhibit abnormalities in this area should not be classified as retarded. For Kathy Johnson, the oldest of seven children, the following observations were thought to support the conclusion that she was retarded: "she does not write letters, does not have her own spending money, she buys her own clothing, she goes out unsupervised, she does not follow current events, and she is left to care for others." The Court is at a loss to understand how any of these characteristics support a finding of mental retardation, nor was Ms. Driver's testimony on this point helpful.

Kathy Johnson was misclassified as an EMR student. Other misclassifications occurred. Dale M., a student at Reidsville High School, spent four years in EMR classes before returning to regular classes in the ninth grade. At that time, he scored 3.8 and 3.7 in the reading and math portions of the CAT. By the time of this twelfth grade testing, Dale was able to score 9.2 and 9.0, respectively, this even though slow

students can be expected to gain in achievement at a slower rate than the average students who are expected to gain about a year in achievement for each chronological year. Another student, Linda J., after having spent two years in EMR, was able to score 9.1 and 12.0 on her twelfth grade retest only months after having scored 8.1 and 6.3 on the reading and math portions of the CAT. The Court cannot escape the conclusion that misclassification has occurred.

Plaintiffs also complain that children enrolled in classes for the mentally retarded are foreclosed from receiving a high school diploma. The State Board of Education, at least at the time evidence was presented in this case, recommended that these students be given diplomas. Sparked by the institution of this suit, the Tattnall County School District has now agreed to give diplomas to any EMR students who meet the CAT requirement. Previously, not all EMR students were allowed to take the CAT. Dr. Hurley testified that although it was very unlikely that a child correctly placed in the EMR program could achieve a 9.0 on the reading and mathematics portions of the CAT, it was possible that a particular child might in time be able to meet the requirement. This policy, which involves the giving of certificates of attendance rather than diplomas to those who fail the CAT, involves no additional factual disputes. The legal implications are discussed below.

VI. *The Legal Conclusions*

A. *The Racial Discrimination Claims*

1. *Equal Protection Claims*

There are two separate racial classification equal protection claims before the Court, the first being that the institution and administration of the diploma policy in itself violates the Fourteenth Amendment and the second being that the diploma policy constitutes a perpetuation of prior *de jure* segregation.

In order to find that the diploma policy itself, without regard to history, violates the equal protection clause, plaintiffs must show both that the policy has a dis-

criminatory racial impact and that the policy is tainted by a discriminatory purpose. Unquestionably, the diploma policy in the Tattnall County School District has had a disproportionate racial impact. This part of the test is adequately met by the evidence. But, beginning with *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), an identifiable discriminatory purpose became a necessary component of a racial discrimination claim brought under the Fourteenth Amendment. Since the subjective state of mind of those implementing a challenged decision is almost always impossible to establish by direct evidence, recent jurisprudence had addressed the question of how circumstantial evidence be employed to prove intent while preserving the requirement that racial animus be proven. The requirement of actual discriminatory intent, first enunciated in *Washington v. Davis* was repeated in the context of school segregation case in *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1979).

The Fifth Circuit addressed the question of intent in light of *Dayton Board of Education v. Brinkman, Washington v. Davis,* and *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), in *United States v. Texas Education Agency,* 564 F.2d 162 (5th Cir. 1977), *rehearing denied,* 479 F.2d 910 (5th Cir. 1978), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979). In that case, the Fifth Circuit held that the evidence overwhelmingly supported the conclusion that a pervasive intent existed to segregate Mexican-Americans. There, the Fifth Circuit apparently adopted an objective standard for discriminatory intent in a challenge based on equal protection. However, the court there made clear that foreseeability alone will not necessarily support a finding of constitutional violation, but that the absence of justifying factors in the light of clearly foreseeable discriminatory impact can support such a conclusion. The Fifth Circuit stated, "When the official actions challenged as discriminatory include acts and decisions

that do not have a firm basis in well accepted and historically sound non-discriminatory social policy, discriminatory intent may be inferred from the fact that those acts had foreseeable discriminatory consequences." *Texas Educational Agency, supra,* 564 F.2d, at 168.

■ Subsequent Supreme Court opinions have made clear that satisfaction of a list of factors is not necessarily sufficient to support a finding of discriminatory purposes. This shopping list approach was clearly rejected in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). There the fact that the discriminatory effect of a statute on women was clearly foreseeable did not mandate a holding that the law was unconstitutional. The Court, in discussing the proper test to evaluate discriminatory purpose explained, "'Discriminatory purpose' ... implies more than intent as volition or intent as an awareness of consequences .... It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney, supra,* 442 U.S. at 279, 99 S.Ct. at 2296. Reading *Feeney* and *Texas Educational Agency* together, the Court concludes that foreseeability alone is insufficient to make out a violation of the Fourteenth Amendment. However, a clearly foreseeable impact which is unexplained by any permissible rationale could support such a finding. The fact of a constitutional violation would then rest—not on the fact of foreseeability—but on a finding of actual discriminatory purpose reached because the circumstances admit no other explanation.

Defendants point to the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in which an at-large method of electing city officials was challenged as violative of the Fourteenth Amendment. There, in assessing the probative value of evidence demonstrating that Negroes suffered discrimination in jobs at the hands of those who were elected under the at-large system, the Court

remarked that such evidence of discrimination by white officials after they were elected was relevant only as the most "tenuous and circumstantial" evidence of the constitutionality invalidity of the at-large system under which they obtained their offices. Similarly, the Supreme Court noted that the "substantial history of official racial discrimination" in Alabama could not taint present governmental actions in the manner of original sin. Discriminatory purpose must be proved in each instance.

■ Defendants argue from *Bolden* that all evidence of past discrimination is irrelevant in this case and evidence on the question of racial purpose should be limited to events immediately surrounding the decision in favor of the CAT policy and its subsequent implementation. The Court disagrees. In the Court's opinion, *Bolden* does not hold or advise that evidence in such a case must be so severely limited. Instead, it underlines the fact which actually must be demonstrated and warns against basing such an important and well-defined fact as purposeful discrimination on marginally relevant facts from which only weak inferences may be drawn.

■ Accordingly, the Court allowed much historical evidence to be admitted. Facts concerning the history of racial segregation in Tattnall County were admitted. The witnesses testifying to the origin of the CAT policy and the reason behind it were carefully observed by the Court. The Court concludes that the policy of requiring a 9.0 on the reading and math portions of the CAT as a graduation requirement was adopted without racial animus. That blacks would suffer a disproportionate impact was foreseeable but not actually foreseen. This is not a case in which foreseeability can arguably be proof of racial animus due to the total lack of justification for the policy. The improvement of the performance of the district's school children is a legitimate and important goal for the Tattnall County School District. The Court finds no evidence whatsoever that the policy was a subterfuge to increase the value of the diploma while denying access to the diploma to

black children. Considered alone, the diploma policy does not violate the Fourteenth Amendment on grounds of racial discrimination.

However, the diploma policy cannot be considered alone and must be evaluated in light of the past *de jure* segregation of the Tattnall County School District. The system of achievement grouping followed close on the heels of the disestablishment of the dual system. The system did not operate fairly. There was substantial overlap of scores between sections with the black children generally being placed in the lower possible group and the white children being placed in the higher group.[6] The racial makeup of the classes was a potent predictor of success on the CAT while for black children, their early IQ scores were not related to their later performance on the CAT.

■ Undoubtedly, the discriminatory impact of the exit exam cannot be considered separately from the *de jure* segregation, which preceded it and the tracking system which perpetuated, and, in some instances, exacerbated the effects of prior segregation. Dr. Hurley testified that the first several years of schooling are crucial in a child's educational development. Yet, the black children who have thus far been subjected to the CAT requirement attended segregated schools during these crucial years. Intentionally segregated schools are illegal *per se*. *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). In addition, it has been demonstrated that the former black elementary school, by the School District's contemporaneous admission, was closed as being substandard when the dual system was abolished in the 1970–1971 academic year. The Court does not hesitate to conclude that the formerly all-black elementary school was substandard as a matter of fact.

■ The duty of a school board in a school system that once operated a *de jure* segregated school system is clear. Those officials have an affirmative duty to convert to a unitary system in which discrimination is to be eliminated root and branch. *Keyes v. School District No. 1, Denver, Colo.*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1972); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). It is also clear that if present facially neutral actions serve to perpetuate past intentional discrimination, there is no requirement that intent be proved again. That present segregation be substantially caused by past intentional discrimination makes out plaintiff's prima facie case even absent proof of a present discriminatory intent. *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *Debra P. v. Turlington*, 474 F.Supp. 244 (M.D.Fla.1979), aff'd, 644 F.2d 347 (5th Cir. 1981). In the presence of an unsatisfied duty to abolish a dual system, the test is the effectiveness, not the purpose of actions in increasing or decreasing the segregation caused by the dual system. *Brinkman, supra*, 443 U.S. at 538–539, 99 S.Ct. at 2979, 61 L.Ed.2d at 734; *Wright v. Council of City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Thus, insofar as the poor performance of the black children is attributable to their participation in the dual system, the diploma sanction must fall. It cannot be constitutionally imposed on those who attended classes in the dual system.

Yet, in the case at bar, the exit exam policy has a disparate impact said to be caused by both absolute segregation in the crucial primary years of the subject students and the tracking system employed by the defendants. The Court is mindful that the exit exam policy complained of here is two causal links removed from the factual situations in the above-cited cases (with the exception of *Debra P. v. Turlington*). In those cases, schools remained segregated, a situation difficult to justify in any circumstance and nearly impossible to justify in light of prior *de jure* segregation.

---

6. Since defendants have voluntarily abandoned their tracking system after an investigation by the Office of Civil Rights, the constitutionality of that system is not before the Court, except as it relates to the constitutionality of the exit exam policy.

The Fifth Circuit has set out guidelines under which tracking practices are to be evaluated. In *McNeal v. Tate County School District*, 508 F.2d 1017 (5th Cir. 1975) the Court of Appeals evaluated a "faculty-predicted ability grouping system." The system produced some all-black sections in the elementary grades and a few all-white sections in the advanced grades. The Court stated, "Notwithstanding the fact that tract assignments are made without regard to race, children who have been the victims of educational discrimination in the dual systems of the past may find themselves resegregated in any school in the district solely because they still wear a badge of their old deprivation—underachievement." *McNeal, supra*, 508 F.2d at 1019. Classroom segregation is proscribed. *See Adams v. Rankin County Board of Education*, 485 F.2d 324 (5th Cir. 1973). When such segregation in the classroom is the result of a facially neutral tracking system, the tracking plan will not be permitted until a unitary system has been established. "At a minimum, this means that the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish School Board*, 444 F.2d 1400, 1401 (5th Cir. 1971). In *McNeal*, the Fifth Circuit charged the district courts with scrutinizing any plan which assigns students to segregated classrooms with "punctilious care." Such a grouping plan may be approved "if the school district can demonstrate that the assignment method is not based on the present results of past segregation or will remedy such results through better educational opportunities." *McNeal, supra*, 508 F.2d at 1020; *United States v. Gadsden County School District*, 572 F.2d 1049 (5th Cir. 1978).

The tracking system practiced until this academic year in the Tattnall County School District clearly cannot pass constitutional muster. The system was adopted on the heels of the abolition of the dual system. The system was not administered fairly; when overlap occurred in placement test scores, black children were placed in the lower section and white children were placed in the higher. No specific remediation programs were utilized—those in the lower levels were simply exposed to less material.

If the tracking system in an otherwise unitary school system has a discriminatory effect, yet will remedy such effects through better education opportunity, the system may pass muster under the *McNeal* balancing test. In a system which has *not* operated as a unitary system, the school system must show that the educational disadvantages caused by prior segregation have ended.

The Court is of the opinion that the CAT policy should be analyzed similarly to tracking systems. The decision to implement tracking and the decision to impose the diploma sanction are both essentially educational decisions but ones which can perpetuate intentional segregation. In order to draw an analogy to the tracking cases, the *McNeal* reasoning would have to be applied as follows: the now abandoned tracking system in Tattnall County occupies the analytical spot held by *de jure* segregation in *McNeal*; the CAT diploma policy here, with its disparate effect on blacks, must be analogized to the tracking system in *McNeal*. Thus, plaintiffs argue, the Fourteenth Amendment is violated here as it was in *McNeal* because at present the School Board cannot show that the educational disadvantages caused by prior segregation have ended. "Prior segregation" here means the discriminatory tracking system.[7]

However, the Court is not entirely easy with the prospect of superimposing the current issue over the analysis of *McNeal*. This concern is limited to the substitutions in the analysis; the Court has no qualms

---

7. The remedial classes, whose racial makeup may differ from the school population as a whole, are not challenged here. Such classes fit the *McNeal* criteria in that the level of racially identifiable classrooms tainted by prior segregation is offset by the compensatory educational benefits. Unquestionably, these classes have aided the learning of those who had been previously disadvantaged.

about disallowing the imposition of the diploma sanction on those who spent their primary years in the dual system. Yet the Court has some difficulty in equating the tracking system recently abandoned in Tattnall County with the dual system recently abandoned in *McNeal*. In *McNeal*, the dual system was such a powerful historical factor that it could taint the resulting tracking system. Although the Fifth Circuit there, in dicta, permitted tracking in a *unitary* system, even where such tracking caused segregation, if the results of past segregation were being remedied through better educational opportunities, the standard for a system not yet unitary was far stricter. Where a unitary system has not been in effect for a sufficient period to assure that underachievement of the slower groups is not due to former educational disparities, the school district must show that the steps taken to bring disadvantaged students to peer status *have ended* the educational disadvantages caused by prior segregation. *McNeal, supra,* 508 F.2d at 1021. Plaintiffs urge the Court that the CAT policy cannot be enforced until the school district has shown that any underachievement of the black children is due to some other factor than prior segregation. Thus, plaintiffs urge that there is no reason to believe that the school district will be able to meet this standard in regard to the graduating class of 1983, the first class never to have attended class under the dual system.

Under plaintiffs' reasoning and if the present case can be successfully analogized to *McNeal*, the burden on the school district is enormous. The burden on the school district would be to demonstrate that the educational disadvantages brought about by prior segregation have ended. If disparities were still apparent, the school district would be obliged to prove that any disparities could not be traced to the extinct tracking system.

The Court has serious reservations about applying *McNeal* in this manner. First, the discriminatory tracking system practiced in Tattnall County is not a social evil of such horrible magnitude as the dual system. As undesirable as the tracking system in the Tattnall County School District was (it has been abandoned), it did not affect all of the students. Approximately one-third of the students were never tracked. Not all of the students who were tracked were placed in racially identifiable classrooms. These facts are not stated in defense of the tracking system, which the Court would not hesitate to strike down were it still viable, but rather to show that the tracking system is not identical to a dual system in which a black child goes to school in a substandard building, uses substandard materials, and sees only black teachers and other black students which, he may unfortunately assume, are also substandard.

The second problem in imposing the *McNeal* reasoning on the facts here is that the practice attacked in *McNeal*—discriminatory tracking—is qualitatively different from the diploma policy attacked here. Discriminatory tracking is a whole system, a way of conducting the business of the school. The CAT, on the other hand, is a method of evaluation. The CAT policy does not affect day to day student life. The CAT policy does affect enrollment in remedial classes but all parties agree that those classes are beneficial. However, it must be emphasized that the CAT is an evaluative device.[8] The Court is reluctant to hold the school district to the stricter *McNeal* standard over its choice of an evaluative device. For example, there was testimony at trial that the Carnegie unit had become so devalued as to be meaningless. Both sides decried this state of affairs. By way of illustration, suppose that the school district had tried to rejuvenate the Carnegie unit system by allowing teachers to test on the subject matter by weekly tests and to refuse to credit those who did not achieve passing grades. If more blacks than whites failed, could it be said that teachers should not be allowed to give any tests on the

---

**8.** The Court does not read the Fifth Circuit's decision in *Debra P., supra,* as requiring a different analysis since the discussion here focus-
es on the tainting effects of the tracking system.

subject matter taught until enough years had passed to make sure that former discriminatory tracking played no part in the results? The criticisms aimed at the CAT could be aimed at any classroom testing. Surely the school district cannot be locked into a system of social promotion until 1992 when no member of the graduating class will have been exposed to discriminatory tracking.

The directives in *McNeal* must act primarily as a guide to this case with its very different facts. Insofar as *McNeal* stands for the proposition that the lingering effects of the dual system cannot be allowed to prejudice students whose educational careers were compromised by their participation in that system, the Order of this Court is in full agreement. Clearly, no diploma sanction may be imposed until June, 1983, when those graduating will never have been exposed to the dual system.

The question remains, what will happen in 1983? Plaintiffs strenuously argue that the Court is in no position to assess what the situation will be in 1983, even though the Court has recognized that the discriminatory effect on blacks has been steadily decreasing. Yet, *McNeal* appears to the Court to have assumed that several years of operation as a unitary system have a purging effect and allow school authorities to again exercise their best judgment and remedy the learning needs of the students, even if some remnants of the dual system in the form of disparate achievement levels remain. The Court believes the higher *McNeal* standard is applicable when school authorities adopt a program which has a racial impact without the intervening period of unitary operation. Showing that educational disadvantages have ended is far more difficult than showing that the policy will remedy the results of past segregation through better educational opportunities, which is the standard set out in *McNeal* under which to judge tracking in an otherwise unitary system.

 Because of the factual differences between this case and *McNeal*, the Court is of the belief that if the equal protection claims were the only bases for challenging the CAT policy, the school district could reinstate the diploma sanction in June, 1983, if it could then show that the increased educational opportunities outweigh any lingering causal connection between the discriminatory tracking system and the imposition of the diploma sanction. Because this area of the law is quickly developing, the Court is careful to analyze plaintiffs' grounds separately. The conclusions on the due process claims dictate a harsher result for the school district than do the equal protection claims.

### 2. The Statutory Claims

 In light of this Court's holding that the diploma policy is violative of the Equal Protection Clause of the Fourteenth Amendment, it follows that the policy is also violative of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. *See Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In light of the Court's holding that the CAT policy violates the Fourteenth Amendment at least until 1983, it is not necessary that any distinction be made at this time between the respective applicable standards. Title VI, at the least, prohibits acts forbidden by the Fourteenth Amendment. Similarly, in light of the holding on plaintiff's equal protection claim, the Court concludes that the imposition of the diploma requirement on black students who previously attended substandard segregated schools and who were then subjected to the tracking system in the Tattnall County schools violates the Equal Educational Opportunities Act, 20 U.S.C. § 1703(b). That section states:

"No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps . . . to remove the vestiges of the dual system."

## B. *The Due Process Claims*

Plaintiffs' due process claims essentially concern two themes. The first is the adequacy of the notice and the second is the reasonableness of the CAT requirement in Tattnall County.

The questions here do not easily lend themselves to a traditional procedural due process analysis. Due process standards applicable when an individual suffers academic consequences from a failure to achieve certain academic standards are not burdensome. In *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1977), the Supreme Court addressed the question of what constitutes proper procedural due process in an academic dismissal. There a medical student challenged on constitutional due process grounds her dismissal from medical school for academic reasons. The Supreme Court assumed that the medical student had been deprived of a liberty or property interest for purposes of analysis. The Court agreed with the district court that the student had been given ample opportunity "to be absolutely certain that their grading of the [respondent] in her medical skills was correct." *Horowitz, supra*, at 85, 98 S.Ct. at 952. The Court apparently envisioned that procedural guarantees were directed toward assuring the student that she actually had failed to meet the standard. Similarly, in *Tyler v. Vickery*, 517 F.2d 1089 (5th Cir. 1975), where, *inter alia*, procedural due process claims were made in regard to the Georgia bar examination, the Court of Appeals stated, "[W]hether due process requires a *particular procedure* in a given situation must be determined by balancing the individual's interest in avoiding the loss which *lack of procedure* inflicts upon him against the interests which the Government seeks to advance by denying it." *Tyler, supra*, 517 F.2d at 1089 (citation omitted) (emphasis added). The Court of Appeals also noted that if a hearing were required, which the

Court decided was not the case, "the issue, of course, would not be whether the examiner had given an applicant the 'correct' grade, but rather whether either a mechanical error had been made in computing the grade or the grade given by the examiner was arbitrary, capricious, and without foundation." *Tyler, supra*, 517 F.2d at 1104.

 The Fifth Circuit in *Debra P.* has decided that receipt of a high school diploma is a property interest.[9] Still, the Court concludes that a procedural due process analysis is not applicable here despite plaintiffs' argument that the procedural and substantive due process issues are "intertwined." Plaintiffs are not complaining that the students in Tattnall County have no opportunity to be heard on how well they actually scored on the CAT. The question of what action would be taken by the school officials in such circumstances has not been litigated and the Court has no reason to assume that a constitutionally satisfactory arrangement would not be developed as it was by the educational authorities involved in *Horowitz* and *Tyler*. The school authorities in this case might be well-advised to give thought to such a mechanism in light of the scoring errors brought to light here even though the Court is confident that, having been informed of scoring problems, the school authorities will make every effort to prevent their reoccurrence.

An additional problem with a procedural due process analysis is that such an analysis focuses on the interest affected by the lack of due process—here, a high school diploma. Traditionally, the due process right concerns an opportunity to be heard on the factual basis underlying the loss of a liberty or property interest, rather than the standard upon which that interest was lost. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Under this reasoning, procedural due process would be required because no diploma was awarded,

**9.** There was no evidence that the fact of any student's failure to attain a diploma has been publicized in any manner by school authorities. Thus, no liberty interest was involved. *Compare Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975) with *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

not because of the nature of the standard applied. Thus, the procedural due process problems are not different from those entailed when a student is denied a diploma for any reason, be it lack of attendance or sufficient credits.

Language in the opinion of several courts, cautions against judicial interference in school affairs where disciplinary matters are not involved. *See Horowitz, supra; Greenhill v. Bailey, supra,* 519 F.2d at 7; *Gaspar v. Bruton,* 513 F.2d 843 (8th Cir. 1975), and cases noted therein.

■ Plaintiffs' complaint that the notice of the CAT requirement provided was constitutionally inadequate is more properly considered as part of their substantive due process claims. In the Court's view, notice becomes constitutionally inadequate when it renders the rule or regulation unreasonable. To the Court's knowledge, only two reported decisions deal with the constitutional adequacy of notice to students of a changed academic regulation. In *Mahavongsanan v. Hall,* 529 F.2d 448 (5th Cir. 1976), the Fifth Circuit noted the "wide latitude and discretion afforded by the courts to educational institutions in framing their degree requirements." 529 F.2d at 450, citing *Militana v. University of Miami,* Fla.App.1970, 236 So.2d 162, *cert. denied,* 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 245 (1971). *Mahavongsanan* concerned a graduate student who was not awarded a degree because she failed a comprehensive test which became a requirement *after* she had begun her graduate studies. On the student's claim that she had been denied substantive due process, the Fifth Circuit stated,

> A review of the record plainly shows that the university's decision to require the comprehension examination was a reasonable academic regulation within the expertise of the university's faculty. Moreover, appellee received timely notice that she would be required to take the comprehensive examination. This is underscored by the fact that the university gave her ample notice to prepare a second time for taking the test.

*Mahavongsanan, supra,* 529 F.2d at 450. The Court of Appeals does not make clear whether the notice problem is one of procedural or substantive due process. The district court, believing that the issue was one of procedural due process, held that the notice of the examination requirement was constitutionally inadequate under the due process clause of the Fourteenth Amendment. *Mahavongsanan v. Hall,* 401 F.Supp. 381 (N.D.Ga.1975), *rev'd,* 529 F.2d 448. The student had enrolled in January, 1974. The requirement was imposed in Fall, 1974. Absent the requirement, Mahavongsanan would have graduated in June, 1975. The district court opinion does not distinguish between notice of and imposition of the exam requirement. However, since the student did not know of the requirement when she enrolled, maximum notice possible under the facts was slightly over a year. The Fifth Circuit found this notice was "timely," particularly in light of the opportunity for reexamination.

■ Public school education does differ from state-supported graduate education in several important respects. Attendance for most of a student's school years is required by law. A community has a vital interest in the proper functioning of its primary and secondary schools although this system is directly responsive to the community through the elected school board. Even considering these differences, there appears to be no reason to depart from the reasoning in *Mahavongsanan.* In the case at bar, a notice period of more than two years, the provision that the test may be retaken, and the provision of remedial courses considered together are not constitutionally inadequate. In view of the judicial system's traditional deference to the educational expertise of school authorities this Court cannot hold that the notice was unreasonable.

In *Debra P. v. Turlington,* 474 F.Supp. 264 (M.D.Fla.1979), *aff'd,* 644 F.2d 347 (5th Cir. 1981) the district court was upheld in a similar case, in its decision that thirteen months' notice was unconstitutionally brief. In *Debra P.,* major coordination problems were presented by the exit examination

which was applicable to the entire state. In the present case, twenty-four months passed between the notice and the implementation of the diploma sanction. Remedial courses were provided during the period. The district court in *Debra P.* stated that the Fifth Circuit in *Mahavongsanan* implicitly acknowledged that termination for academic reasons which have not remained static created a due process right to timely notice. The Fifth Circuit approved this reasoning. Nevertheless, this Court is of the opinion that notice was timely here. No one could seriously contend that academic requirements could never be changed during the twelve years a child typically spends in school. It is also obvious that the CAT requirement could not have been constitutionally imposed a day prior to graduation. Such late notice could serve no academic purpose. Plaintiffs contend that since many skills are taught in the primary grades and defendants' system of social promotion resulted in some students being moved through these grades without having mastered the material appropriate to those grades, it is fundamentally unfair to deny a diploma on the basis of a requirement added at the eleventh hour. This argument overlooks the availability and efficacy of the remedial program, and the motivational value of the diploma sanction.

■ In addition to their attack on the reasonableness of the notice, plaintiffs' general standard by which to judge substantive due process is well-defined in the law. The School Board's actions are entitled to a presumption of legislative validity and the burden is on plaintiffs to show that there is no rational connection between the Board's action and its legitimate interest in improving the educational experience of the students in Tattnall County. *Harrah Independent School District v. Martin,* 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1978). The individual is to be protected against arbitrary government action. *Meachum v.*

*Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). If an academic decision by a public educational institution is to be reviewed at all, the standard is that it may not be arbitrary and capricious. *Horowitz, supra,* 435 U.S. at 92, 98 S.Ct. at 956.[10]

The objective of the CAT policy, to improve the educational product of the Tattnall County School District, is an obviously legitimate goal within the proper province of the school board. The Court has no reason to doubt that the motives for the CAT policy were as testified to here. Defendants wished to imbue the diploma with additional meaning. They wished to motivate the students to strive for greater academic achievement and provide the means necessary in remedial classes for students to attain that level of achievement. The Court agrees with the district court in *Debra P.* that the goal of the exit exam policy is a legitimate goal of the Tattnall County School District.

■ As the Supreme Court has recently reemphasized, the determination of rationality is made at the time of the legislative decision. Whether or not an *empirical* relationship exists, the legislative purpose and the action taken is not the question. Instead " 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker.' *Vance v. Bradley,* 440 U.S. [93], at 111 [99 S.Ct. 939, 59 L.Ed.2d 171]." *Minnesota v. Clover Leaf Creamery Company,* 449 U.S. 457, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

■ Plaintiffs' attack centers on the contention that the means employed, the requirement that each student achieve a 9.0 rating on the CAT in order to receive a diploma, is not reasonably related to the goals expressed. Some of plaintiffs' attacks on the rationality of the CAT requirement are more troublesome than others.

---

**10.** The Court is aware of the factual distinction between *Horowitz* and the case at bar: that compulsory secondary education is arguably subject to a stricter standard of review. Yet the Court does not find support for this view in the case law or in the reasoning underlying the decisions in *Horowitz* and *Mahavongsanan.* The ready accountability of school board members to the community arguably weighs the argument against a stricter standard.

The failure of the requirement of the 9.0 level to take into account the standard error of measurement does not render the CAT requirement irrational. As noted above, Dr. Findlay testified that the importance of the standard error of measurement diminishes with repeated test administrations since the error of measurement will not always operate to a student's disadvantage. In addition, the problem may be one of semantics rather than of constitutional proportion since the concept of the standard error of measurement simply redefines the cutoff score as one somewhat above the announced 9.0. In the absence of convincing argument that the 9.0 level represents the highest level of achievement which may be constitutionally required, the Court is not persuaded that recognition of the fact that a standard error of measurement exists mandates the conclusion that the test requirement is unreasonable.

Nor is the Court persuaded that use of Level 19 rather than Level 18 is an irrational decision for purposes of constitutional evaluation. According to Defendants' Exhibit 7, Technical Bulletin for the CAT, Level 19 is appropriate for use from grade 9.6 to 12.9. Plaintiffs argue that since 9.0 is the cutoff point, that level of the test which encompasses the 9.0 point, Level 18, is more appropriate. However, the majority of the CAT testing takes place after the middle of the ninth grade. Thus, except for a small portion of the test administration, the test is being administered in accordance with the instructions in the technical bulletin. The Court finds no denial of substantive due process in use of Level 19.

Plaintiffs also contend that the test was not designed for the purpose for which it is being used invoking the need for special safeguards. *Armstead v. Starkville Municipal Separate School District,* 461 F.2d 276 (5th Cir. 1972). In that case, a requirement that school teachers achieve a certain score on the Graduate Record Examination (GRE) was struck down. The GRE was designed to determine the test taker's aptitude for graduate study. In *Armstead,* the superintendent of schools admitted that he knew that the GRE had nothing to do with

teacher competency. However, the case at bar presents an entirely different set of facts. The CAT is being used to determine how a student is achieving in relationship to other students across the country. That the CAT is well-designed to perform this task was not successfully disputed at trial. Ms. Bryan, plaintiffs' chief expert witness, testified that she favorably reviewed the 1970 edition of the CAT when it was published. Here the school authorities have redesigned the criteria for graduation stating that a student must perform at least on a level four years below his average counterpart across the nation. The CAT was capable of producing just such a comparison. That a student be able to perform at an average ninth grade level was a legitimate and relevant expectation for the school authorities to hold for their students. This state of affairs is in contrast to the situation in *Armstead* where a teacher's aptitude for doctoral studies admittedly had no relevance to his ability to teach.

Since the CAT is being used to measure what it was designed to measure, i. e., relative achievement levels in mathematics and reading, the Court is of the opinion that local revalidation was not necessary. Basing the receipt of a diploma on a ninth grade achievement level was not unreasonable. Defendants did not concoct a homemade examination but chose instead to rely on a professionally constructed and well-regarded examination.

■ Yet plaintiffs' contentions go beyond the conclusions above. Even if the decision to require achievement at the ninth grade level on the CAT was not in itself unreasonable, plaintiffs contend that, contrary to nationwide experience, the CAT results in Tattnall County schools are neither reliable nor valid. This argument attacks the results of implementing the CAT policy rather than rationality of its adoption. Legislative action may not be invalidated on the grounds that the evidence shows that the legislature was mistaken. *Clover Leaf Creamery, supra,* —— U.S. at ——, 101 S.Ct. at 724, 66 L.Ed.2d at

669. However, even if the results of the CAT policy were relevant, those results would demonstrate that the beneficial result of the policy is "at least debatable." *See United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938).

The evidence resulting from the adoption of the CAT policy is only marginally probative on the issue of the rationality of its adoption. However, the results were generally supportive of rationality. On the issue of reliability, plaintiffs' unrefuted evidence showed test results which varied greatly for some students over a period of time. As discussed above, some students made gains beyond what could have been hoped for while some others lost ground on some administrations. While the standardization conducted by CTB McGraw-Hill must have included aberrations in the performance of individual students, the opinion of plaintiffs' expert was that reliability of the CAT in Tattnall County was below what was professionally acceptable.

The issue of validity presents similar difficulties. Although the Court disagrees with plaintiffs' contention that school authorities should have conducted local validation studies before the CAT policy was implemented, those studies have been performed by plaintiffs. As outlined above, many items did not meet the standards set by CTB McGraw-Hill.

Yet the Court is not of the opinion that these difficulties render the CAT policy an irrational means to a legitimate end. The CAT is not a hastily constructed vehicle, but rather a test instrument constructed with the utmost care. It is difficult to explain the disparity of the results obtained in the Tattnall County public schools. The Court cannot conclude that this well-respected test instrument is unsuitable for use in Tattnall County.

The only apparent explanation, other than that the students in Tattnall County are very different from students in the rest of the United States, is that the students experienced differences in motivation on successive testings. The fact is difficult to explain.

Nevertheless, evidence of the success of the CAT policy in Tattnall County is enough to sustain the policy against the charge of irrationality, were such results the basis for deciding this issue. The educational plan which combines the diploma sanction with a remedial program is drastically reducing the numbers of departing seniors who cannot score at the beginning ninth grade level on the CAT. The testimony of defendants was essentially uncontradicted that the need for remedial classes has lessened. The motivational change in the students and teachers was testified to and defendants' figures show that those *entering* high school outperform their counterparts of a few years earlier. It is true that the increases in the CAT scores have not yet been reflected in the Georgia CRT scores. Yet since the results of the policy include better academic performance, an increased enthusiasm for learning, and a reduced need for remediation, the Court holds that the CAT policy, insofar as the above-discussed grounds are concerned, is rationally related to a legitimate goal of the School Board.

However, an additional and dispositive argument must be discussed. Plaintiffs have argued that there must be a nearly exact match between the questions on the test and the curriculum. This view was recently upheld by the Fifth Circuit in *Debra P., supra.* There the Fifth Circuit declared a Florida exit examination violative of substantial due process standards in that it *may* have covered matters not taught in the schools. The Court of Appeals later stated that the test must be a "fair test" of that which was taught.

This standard is not easily applied to the facts in this case. Ms. Larson's testimony made it clear that not everything that was taught by the Scott-Foresman series was covered by the CAT. Those in remedial classes had even less of their material covered by the CAT. More importantly, because of the difficulties outlined *supra,* at 491, the match was not performed the other way, and Ms. Larson did not determine whether all of the materials appearing

on the CAT had actually been taught. However, Ms. Bryan did testify that the type of questions included on the CAT should be covered by any recognized standard curriculum.

There are factual distinctions between this case and the situation presented in *Debra P.* In *Debra P.* the state hastily concocted an examination and implemented it in a statewide area in the space of slightly more than a year. In the case at bar, the school authorities selected a reliable and well-established test instrument. This appears to the Court to be sound practice in that the school authorities took advantage of the expertise of professional test constructors rather than hastily put together their own instrument. However, in light of the strong language in *Debra P.*, the Court has no choice but to conclude that the Tattnall County School District has not sustained its burden. The Fifth Circuit in *Debra P.* concluded that "fundamental fairness requires that the state be put to test on the issue of whether the students were tested on material they were or were not taught." *Debra P.*, at 406. The Court can only conclude that where the award of a diploma depends on the outcome of a test, the burden is on the school authorities to show that the test covered only material actually taught.[11]

Since Ms. Bryan's testimony says no more than that the test probably contains items that were taught, the Court must conclude that the school authorities have not met the test of *Debra P.* Because it has not been demonstrated that the items on the CAT were actually taught in the Tattnall County schools, the use of the CAT as an exit exam must fall on substantial due process grounds. This conclusion must be reached in spite of the demonstrated success of the CAT policy.

### C. The Claims of Those Students Classified as Mentally Retarded

Plaintiffs' claim on behalf of this group is essentially two-pronged. First, it is argued that the diploma policy unlawfully forecloses the possibility that mentally retarded students may obtain diplomas. Secondly, it is argued that the diploma policy is unlawful in light of the fact that many children presently classified as mentally retarded have been classified improperly.

### 1. The Effect of the Diploma Policy on Children Accurately Classified

Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, prohibits discrimination or denials of benefits or participation in programs if the discrimination is based on the fact that the individual is handicapped but is otherwise qualified for such program or benefit. 45 C.F.R. § 84.1, § 84.4. The Tattnall County School District is the recipient of federal funds.

The Fifth Circuit has indicated that § 504 is enforceable in a private cause of action. *University of Texas v. Camenisch*, 616 F.2d 127 (5th Cir. 1980), review granted, 449 U.S. 950, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980), vacated and remanded on other grounds, —— U.S. ——, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). This decision is in accord with decisions in other circuits. *See Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296 (2nd Cir. 1977).

That no exhaustion of administrative remedies is required is indicated by *Camenisch*. The Fifth Circuit held that the question of whether a private cause of action exists is clearly bound to the question of whether exhaustion of administrative remedies is a prerequisite to suit under § 504. The court reasoned that while the HEW procedures could result in a termination of funding for an educational institution, those procedures "do not provide the most appropriate or exclusive remedy to vindicate personal § 504 rights." *Camenisch, supra*, 616 F.2d at 134. The court reasoned that the administrative remedies would provide no relief to plaintiff and would worsen plaintiff's position.

---

11. The Court is curious as to whether the ruling in *Debra P.* will mean that in the future any diploma determinative test, perhaps a final exam in senior English, will require this justification by school authorities.

It is true that in the case at bar, a class of individuals is suing and there are procedures available to challenge individual placement decisions. Yet, in light of the Fifth Circuit's pronouncements, this Court has no hesitancy in deciding that a private cause of action exists under § 504 and that exhaustion is not required. *See Larry P. v. Riles*, 495 F.Supp. 926 (N.D.Cal.1979), at 56.

In evaluating the claim that the diploma policy violates § 504, the question which must be answered is whether the children in the special education programs are "otherwise qualified" to receive a diploma. The Court notes that, although children who are classified as mentally retarded have not been awarded diplomas in the past, school authorities have now agreed to allow the children so classified to take the CAT. Dr. Hurley testified that it was possible, although unlikely, that a child properly classified as mentally retarded might eventually reach the 9.0 level on the CAT. Thus, the situation in which the children classified as mentally retarded are automatically foreclosed from competing for a diploma does not now exist in the Tattnall County schools.

However, plaintiffs argue that by placing those children classified as mentally retarded in special classes these children are never exposed to a curriculum which would enable them to pass the CAT. As Dr. Hurley testified, this is essentially true. The emphasis in programs for the mentally retarded is not on academic matters but on practical skills. While a child who is truly mentally retarded will profit more from such an individualized program of instruction than from the instruction in a regular classroom, he will be less well prepared for a test like the CAT. Plaintiffs acknowledge that the mentally retarded are benefited by the special programs but argue that to deny a diploma to one who has successfully completed the appropriate program of instruction is to discriminate against an "otherwise qualified" handicapped individual.

The case law has not provided a set of circumstances identical to the ones at hand. However, an examination of the cases which do deal with the concept of "otherwise qualified" rely on the concept that if the handicap is extraneous to the activity sought to be engaged in, the handicapped person is "otherwise qualified." In *Kampmeier v. Nyquist*, 553 F.2d 296 (2nd Cir. 1977) two high school students, each of whom had vision in only one eye, tried to enjoin the public school authorities from excluding them from participation in contact sports. The Second Circuit upheld the denial of a preliminary injunction. In discussing the meaning of "otherwise qualified" the Second Circuit stated:

> As we read § 504, however, exclusion of handicapped children from a school activity is not improper if there exists a substantial justification for the school's policy. Section 504 prohibits only the exclusion of handicapped persons who are "otherwise qualified." Here the defendants have relied on medical opinion that the children with sight in only one eye are not qualified to play in contact sports because of the high risk of eye injury.

*Kampmeier, supra*, 553 F.2d at 299.

The increased risk of injury was inseparable from the combination of the physical handicap and the sought activity.

In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court followed this reasoning. The case concerned a woman with serious hearing disability who was not admitted to a program which culminated in an Associate Degree of Nursing which would have made her eligible for state certification as a registered nurse. However, she could understand normal spoken speech only by looking directly at the speaker. Thus, she was at a large disadvantage in the operating room where masks are worn or in any instance when a physician or patient needed to get her attention without being able to face her squarely.

The Supreme Court agreed with the district court and held that plaintiff was not "otherwise qualified." The Court stated that mere possession of a handicap is not a permissible ground for assuming inability to function in a particular context. The Court

went on to define "otherwise qualified" as "one who is able to meet all of a program's requirements in spite of his handicap." 442 U.S. at 406, 99 S.Ct. at 2367. Ms. Davis' handicap was inseparable from her ability to perform as a registered nurse. The Court recognized that "the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons will not always be clear. 442 U.S. at 412, 99 S.Ct. at 2370. Yet, the opinion clearly stands for an interpretation of Section 504 which recognizes that if the handicap *itself* prevents the individual from participation in an activity program, the individual is not "otherwise qualified" within the meaning of the statute.

In the case at bar, actual participation in a program is not at issue. All agree that the special education programs offered to the mentally retarded benefit them more than would the normal academic program available. These children, by the very nature of their handicap, cannot fully participate in the normal academic programs. What the Court is faced with is essentially an argument that an educational institution has no right to define its standards. The definition of "diploma" is what is challenged rather than a barrier to a program. Plaintiffs argue that because the school authorities have chosen to define their diploma to reflect a certain level of academic accomplishment, unlawful discrimination exists against those who cannot meet that standard because of their handicaps. The Supreme Court in *Davis* stated: "Section 504 imposes no requirement upon an education institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." 442 U.S. at 413, 99 S.Ct. at 2370. While the school authorities are free to award regular diplomas to any student, no matter what the level of achievement reached, the Court concludes that Section 504 does not require such action.

The Court is not persuaded by plaintiffs' argument that the reasoning in *Davis* does not apply here because postsecondary education is encompassed by Subpart F, 45 C.F.R. § 84.41 *et seq.* of the regulations under the Act while Subpart D dealing with preschool, elementary, and secondary education is relevant here. Plaintiffs point to 45 C.F.R. § 84.3(k) which defines "Qualified handicapped person" as any person of an age where non-handicapped persons are provided such services. The definition appears to aid a school district in determining who must be provided free appropriate education. To suggest that by virtue of that language in the definition, any standard or requirement which has a disparate effect on the handicapped is presumed unlawful is far-fetched. The repeated use of the word "appropriate" in the regulations suggests that different standards for the handicapped are envisioned by the regulations.

The Court notes that it does not believe that the Fifth Circuit's recent decision in *S–1 v. Turlington*, 635 F.2d 342 (5th Cir. 1981), requires a different result here. In that case, several students were expelled for misconduct which may have been a manifestation of the very handicaps the students possessed. To provide for expulsion of students on the basis of their handicap would fly in the face of the statute which guarantees that all school-age handicapped children shall receive an appropriate education. However, in the case at bar, it is not questioned that those properly classified as EMR students are receiving an appropriate education. Whether the recognition of the fact that this appropriate education is not the academic equivalent of the regular scholastic program is not touched on in *S–1 v. Turlington*.

2. *The Effect of the Diploma Policy on Those Misclassified as Mentally Retarded*

Section 504 and the regulations issued thereunder do seek to protect the rights of those who have been misclassified as handicapped. Section 84.3(j) of Title 45, Code of Federal Regulations (1979) defines "Handicapped person" as any person who "(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having

such an impairment." Section 84.3(2)(iii) makes clear that one who is misclassified as having such a mental impairment is covered by the statute and regulations. The regulations promulgated under Section 504 set out the criteria which are to be used in evaluating a student for special placement. 45 C.F.R. § 84.35(c). As found above at pp. 45–47, many instances of misclassification or lack of necessary placement procedures have occurred. The records of only a sample of the students classified as mentally retarded have been examined by the Office of Civil Rights. The Court holds that Section 504 has been violated by misclassification and absence of proper procedure. Counsel for plaintiffs and defendants shall meet and submit a plan to the Court to provide for the reevaluation of those presently so classified. The parties shall also submit a plan to provide for the remediation of those students who have been misclassified.

### 3. The Equal Protection Claims of the Handicapped

The Court is at a loss to understand how the equal protection clause is violated. The Court will insure that those who have been misclassified will be identified and provided with remediation. The Court does not find any intentional misclassification. Nor does the Court conclude that the diploma policy creates a quasi-suspect class. Plaintiffs have pointed to no opinion by a court of appeals holding that mentally retarded persons are a quasi-suspect class. In addition, since the diploma policy merely sets out an academic qualification for a diploma, it no more discriminates against the mentally retarded than does a requirement that a certain number of Carnegie units be earned. Many academic requirements may be beyond the abilities of these children. Yet, academic standards are obviously important to the legitimate interest of educating students. To applaud the efforts in recent years to develop the poten-

tial of these unfortunate students is not to require that a diploma be issued to cover all degrees of academic achievement, no matter how meager.[12]

### VI. Summary

In conclusion, since the CAT policy violates due process, all plaintiffs, including those in *Anderson v. Banks*, prevail. Defendants are ordered to award diplomas to all students who would have received them except for the existence of the CAT policy. No exit exam policy may be utilized until it is demonstrated that the test used is a fair test of what is taught.

In *Johnson v. Sikes*, Classes 1 and 1a prevail on their equal protection claim. Defendants may not impose the diploma sanction on any member of these classes until the graduation of the Class of 1983 which will mark the first group who began their education after the abolition of the dual system. The period between this date and June, 1983 will also provide an opportunity for the remedial programs now available to overcome the effects of the now-abandoned tracking system. The school authorities are to outline the continued benefits to the Court in 1983 before any denial of diplomas takes place. Of course, defendants must also remedy the due process violation before any exit exam may be reinstated.

Class 2 in *Johnson v. Sikes* prevails insofar as misclassification has occurred. Insofar as the students in Class 2 who have been accurately classified, and who are given the opportunity to take the CAT, should it be properly reinstated, the Court finds no fault with the diploma sanction.

Defendants shall submit their proposals for reevaluation of the students classified as related by June 29, 1981. Plaintiffs may respond on or before July 8, 1981, at 1:30 P.M. A hearing will be held at that time to determine the particular procedures and timetable necessary to remedy the misclassification.

12. Judge Bua's opinion in *Sterling v. Harris*, 478 F.Supp. 1046 (N.D.Ill.1979) finding that statutory classifications based on mental illness are quasi-suspect is not helpful here. The Su-

preme Court reversed in *Schweiker v. Wilson*, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981), without deciding whether the mentally ill were a suspect class.

## APPENDIX

Seckinger Elementary, 1971

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---|---|---|---|---|---|---|---|
| Williams | W | K | 0 | ( 0%) | 49 | (100%) | |
| Blocker | W | 1st | 13 | (48%) | 14 | ( 52%) | |
| Daniel | W | 1st | 11 | (42%) | 15 | ( 58%) | 1 |
| Horrell | W | 1st | 12 | (44%) | 15 | ( 56%) | |
| Heyward | B | 1st | 10 | (42%) | 14 | ( 58%) | 4 |
| Parker | W | 1st | 12 | (46%) | 14 | ( 54%) | 1 |
| Griner | W | 1st | 11 | (44%) | 14 | ( 56%) | 2 |
| Ray | W | 2nd | 0 | ( 0%) | 27 | (100%) | |
| Mincey | B | 2nd | 3 | (11%) | 24 | ( 89%) | |
| Herrington | B | 2nd | 13 | (52%) | 12 | ( 48%) | 4 |
| Carter | W | 2nd | 13 | (52%) | 12 | (.48%) | |
| Beasley | W | 2nd | 21 | (100%) | 0 | ( 0%) | 2 |
| Lewis | B | 3rd | 5 | (19%) | 21 | ( 81%) | |
| Moody | W | 3rd | 3 | (11%) | 25 | ( 89%) | 2 |
| Delooch | W | 3rd | 4 | (14%) | 25 | ( 86%) | |
| Carr | W | 3rd | 16 | (53%) | 14 | ( 47%) | |
| Akins | W | 3rd | 22 | (100%) | 0 | ( 0%) | 4 |
| Wilson | W | 4th | 0 | ( 0%) | 32 | (100%) | |
| Waters | W | 4th | 17 | (65%) | 9 | ( 35%) | 1 |
| Wall | W | 4th | 0 | ( 0%) | 31 | (100%) | |
| Rogers | W | 4th | 11 | (41%) | 16 | ( 59%) | 5 |
| Clark | B | 4th | 18 | (69%) | 8 | ( 31%) | 1 |
| Mincey | B | Special Ed. | 4 | (67%) | 2 | ( 33%) | |

Seckinger, 1972

| Teacher | Race | Grade | # of Black students | | # of White students | | Race Unknown |
|---|---|---|---|---|---|---|---|
| Harrell | X | K | 9 | (26%) | 26 | (74%) | 2 |
| Burkhalter | W | K | 22 | (69%) | 10 | (31%) | |
| Williams | W | K | 0 | ( 0%) | 32 | (100%) | |
| Sikes | W | 1st | 3 | (13%) | 21 | (87%) | |
| Hayward | B | 1st | 13 | (57%) | 10 | (43%) | |
| Dean & Moody | W X | 1st | 9 | (56%) | 7 | (44%) | |
| Griner | W | 1st | 9 | (38%) | 15 | (62%) | 1 |
| Parker | W | 1st | 13 | (76%) | 4 | (24%) | 2 |
| Roy | W | 2nd | 4 | (14%) | 24 | (86%) | |
| Carter | W | 2nd | 11 | (39%) | 17 | (61%) | 2 |
| Blocker | W | 2nd | 9 | (32%) | 19 | (68%) | |

**514**

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|------|------|------|------|------|
| Beasley | X | 2nd | 13 | (48%) | 14 | (52%) | 1 |
| Herrington | B | 2nd | 20 | (71%) | 8 | (29%) | |
| Tarver & Dasher | X W | 3rd | 2 | ( 8%) | 23 | (92%) | 3 |
| Delooch | W | 3rd | 4 | (17%) | 19 | (83%) | |
| Carr | W | 3rd | 10 | (42%) | 14 | (58%) | |
| Akins | X | 3rd | 15 | (71%) | 6 | (29%) | |
| Daniel | W | 3rd | 19 | (79%) | 5 | (21%) | |
| Wall | W | 4th | 5 | (15%) | 28 | (85%) | |
| Rogers | W | 4th | 5 | (16%) | 26 | (84%) | |
| Waters | W | 4th | 6 | (18%) | 27 | (82%) | 1 |
| Mincey | B | 4th | 17 | (74%) | 6 | (26%) | 1 |
| Wilson | W | 4th | 15 | (75%) | 5 | (25%) | |
| Mincey | B | Special Ed. | 10 | (100%) | 0 | ( 0%) | |

Seckinger Elementary, 1973

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|------|------|------|------|------|
| Carr | W | 3rd | 11 | (39%) | 17 | (61%) | |
| Delooch | W | 3rd | 1 | (4%) | 26 | (96%) | |
| Rogers | W | 4th | 3 | (10%) | 28 | (90%) | |
| Waters | W | 4th | 7 | (26%) | 20 | (73%) | |
| Wilson | W | 4th | 12 | (60%) | 8 | (40%) | |
| Mincey | B | 4th | 16 | (84%) | 3 | (16%) | |
| Wall | W | 4th | 16 | (76%) | 5 | (24%) | |
| Mincey | B | Special Ed. | 11 | (100%) | 0 | ( 0%) | |

Seckinger Elementary, 1974

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|------|------|------|------|------|
| Heyward | B | 1st | 5 | (19%) | 21 | (81%) | 4 |
| Parker | W | 1st | 12 | (43%) | 16 | (57%) | |
| Griner | W | 1st | 19 | (66%) | 10 | (34%) | |
| Moody | W | 1st | 12 | (75%) | 4 | (25%) | 2 |
| Beasley | W | 2nd | 5 | (17%) | 24 | (83%) | |
| Herrington | B | 2nd | 11 | (37%) | 19 | (63%) | 2 |
| Ray | W | 2nd | 15 | (65%) | 8 | (35%) | 1 |
| Thompson | W | 3rd | 17 | (71%) | 7 | (29%) | 1 |
| Delooch | W | 3rd | 12 | (52%) | 11 | (48%) | |
| Larkey | W | 3rd | 11 | (42%) | 15 | (58%) | 1 |
| Carr | W | 3rd | 6 | (21%) | 23 | (79%) | |
| Dubberly | W | 4th | 17 | (68%) | 8 | (32%) | |
| Wall | W | 4th | 17 | (65%) | 9 | (35%) | 1 |

| Teacher | Race | Grade | # of Black students | | # of White students | | Race Unknown |
|---------|------|-------|-------|------|------|------|------|
| Mincey | B | 4th | 11 | (41%) | 16 | (59%) | |
| Wilson | W | 4th | 9 | (29%) | 22 | (71%) | |
| Waters | W | 4th | 1 | ( 3%) | 31 | (97%) | |
| Mincey | B | Special Ed. | 10 | (100%) | 0 | ( 0%) | |

Seckinger Elementary, 1978

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|-------|------|------|------|------|
| Burkhalter | W | K | 11 | (44%) | 14 | (56%) | 1 |
| Harrell | W | K | 10 | ( %) | 10 | ( %) | 2 |
| Weaver | W | K | 12 | (50%) | 12 | (50%) | |
| Tillman | B | K | 8 | (47%) | 9 | (53%) | |
| Woodcock | W | K | 7 | (41%) | 10 | (59%) | |
| Parker | W | 1st | 2 | ( 8%) | 12 | (92%) | 1 |
| Griner | W | 1st | 4 | ( 4%) | 20 | (96%) | |
| Moody | W | 1st | 8 | (31%) | 18 | (69%) | |
| Cook | W | 1st | 11 | (44%) | 14 | (56%) | |
| Edwards | W | 1st | 20 | (87%) | 3 | (13%) | 1 |
| Tootle | W | 2nd | 1 | ( 5%) | 19 | (95%) | |
| Baxter | W | 2nd | 5 | (22%) | 18 | (78%) | |
| Smith | W | 2nd | 7 | (33%) | 14 | (67%) | |
| Hadden | W | 2nd | 9 | (43%) | 12 | (57%) | 1 |
| Mincey | B | 2nd | 14 | (82%) | 3 | (18%) | 1 |
| Anderson | W | 3rd | 1 | ( 4%) | 24 | (96%) | 1 |
| Woods | W | 3rd | 6 | (26%) | 17 | (74%) | |
| Delooch | W | 3rd | 8 | (38%) | 13 | (62%) | |
| Dubberly | W | 3rd | 10 | (63%) | 6 | (37%) | |
| Patterson | W | 3rd | 8 | (67%) | 4 | (33%) | 2 |
| Mincey | B | Special Ed. | 13 | (87%) | 2 | (13%) | |

Seckinger Elementary, 1978-1979

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|-------|------|------|------|------|
| Moody | W | 1st | 2 | ( 7%) | 26 | (93%) | |
| Cook | W | 1st | 14 | (54%) | 12 | (46%) | 1 |
| Sheffield | W | 1st | 13 | (46%) | 15 | (54%) | |
| Daniels | W | 1st | 16 | (89%) | 2 | (11%) | 1 |
| Patterson | W | 2nd | 4 | (15%) | 22 | (85%) | |
| Anderson | W | 2nd | 2 | ( 8%) | 22 | (92%) | 1 |
| O'Neal | W | 2nd | 9 | (39%) | 14 | (61%) | 2 |
| Mincey | B | 2nd | 7 | (33%) | 14 | (67%) | |

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|------|------|------|------|---------|
| Timpson | B | 2nd | 15 | (88%) | 2 | (12%) | 1 |
| Woods | W | 3rd | 1 | ( 4%) | 24 | (96%) | |
| Delooch | W | 3rd | 6 | (24%) | 19 | (76%) | |
| Dubberly | W | 3rd | 12 | (50%) | 12 | (50%) | : |
| Thompson | B | 3rd | 12 | (55%) | 10 | (45%) | |
| Rogers | W | 3rd | 14 | (88%) | 2 | (12%) | |
| Mincey | B | Special Ed. | 12 | (100%) | 0 | ( 0%) | |

Seckinger Elementary, 1980

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|------|------|------|------|---------|
| Cook | W | 1st | 2 | ( 8%) | 23 | (92%) | 4 |
| Sheffield | W | 1st | 5 | (20%) | 20 | (80%) | 2 |
| Daniel | X | 1st | 8 | (36%) | 14 | (63%) | 2 |
| Joiner | W | 1st | 17 | (94%) | 1 | ( 6%) | 1 |
| Moody | W | 1st | 8 | (52%) | 7 | (48%) | 1 |
| Anderson | W | 2nd | 2 | ( 9%) | 20 | (91%) | 1 |
| O'Neal | W | 2nd | 5 | (25%) | 15 | (75%) | 1 |
| Frazier | B | 2nd | 10 | (53%) | 9 | (47%) | |
| Monoso | W | 2nd | 8 | (57%) | 6 | (43%) | 4 |
| Meeks | W | 2nd | 12 | (86%) | 2 | (14%) | 2 |
| Woods | W | 3rd | 12 | (86%) | 2 | (14%) | 2 |
| Powell | W | 3rd | 12 | (50%) | 12 | (50%) | |
| Mincey | B | 3rd | 11 | (48%) | 12 | (52%) | 1 |
| Dubberly | W | 3rd | 2 | ( 8%) | 23 | (92%) | |
| Delooch | W | 3rd | 5 | (20%) | 20 | (80%) | 1 |
| Mincey | B | Special Ed. | 15 | (94%) | 1 | ( 6%) | |

Glennville Middle School, 1973

| Teacher | Grade | % Black | Unknown # / Total |
|---------|-------|---------|---------|
| Hughes | 7 | 9 | 9 | 31 |
| Purcell | 7-C | 15 | 7 | 20 |
| Park | 7 | 100 | 7 | 17 |
| DeLoach | 7 | 18 | 9 | 31 |
| Thompson | 5 | 88 | 1 | 18 |
| Lackey | 5 | 61 | 2 | 20 |
| Humphrey | 5 | 12 | 4 | 36 |
| Banks | 5 | 32 | 7 | 35 |
| Lewis | 5 | 12 | 4 | 36 |
| Jones | 6 | 18 | 4 | 32 |
| Burkhalter | 6-E | 80 | 3 | 20 |
| Wilkerson | 6 | 56 | 2 | 20 |

| Teacher | Grade | % Black | Unknown # / | Total |
|---------|-------|---------|-------------|-------|
| Rogers | 6-C | 59 | 7 | 34 |
| Purvis | 6 | 6 | 1 | 33 |
| Ashford | 7 | 53 | 11 | 28 |

**1974**

| Teacher | Grade | % Black | Unknown # / | Total |
|---------|-------|---------|-------------|-------|
| Burkhalter | 6-D | 78 | 2 | 34 |
| Jones | 6 | 8 | 0 | 35 |
| DeLoach | 6 | 16 | 6 | 37 |
| Purvis | 6 | 33 | 5 | 35 |
| Hughes | 8 | 28 | 8 | 29 |
| King | 8 | 35 | 13 | 33 |
| Mikel | 8 | 63 | 12 | 31 |
| DeLoach | 8 | .4 | 5 | 27 |
| Durrence | 8 | 83 | 10 | 16 |
| Purcell | 7-E | 88 | 2 | 19 |
| Odom | 7 | 17 | 2 | 32 |
| Turner | 7 | 7 | ..1 | 31 |
| Lynch | 7-C | 35 | 5 | 28 |
| Ashford | 7 | 61 | 5 | 23 |

Glennville Middle School, 1975

| Teacher | Grade | %Black | Unknown# / | Total |
|---------|-------|--------|------------|-------|
| Milner | 8 | 71 | 6 | 27 |
| Durrence | 8 | 34 | 3 | 32 |
| Hughes | 8 | 12 | 2 | 35 |
| DeLoach | 8 | 41 | 8 | 35 |
| Barrinecin | 7 | 10 | 2 | 32 |
| Purcell | 7 | 42 | 4 | 28 |
| Ashford | 7 | 27 | 3 | 32 |
| Turner | 7 | 33 | 7 | 37 |
| Odom | 7 | 82 | 4 | 18 |

**1976**

| Teacher | Grade | %Black | Unknown# / | Total |
|---------|-------|--------|------------|-------|
| Hughes | 8 | 9 | 1 | 34 |
| Durrence | 8 | 16 | 3 | 34 |
| Tomblin | 8-D | 50 | 5 | 29 |
| DeLoach | 8 | 35 | 3 | 34 |
| King | 8 | 86 | 2 | 16 |

Tattnall Elementary , 1971

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|--------|------|--------|------|------|
| Hardy | B | Special Ed. | 4 | (57%) | 3 | (43%) | |
| Roundtree | W | 1st | 4 | (14%) | 25 | (86%) | |
| Jordon | W | 1st | 7 | (25%) | 21 | (75%) | |
| Collins | W | 1st | 7 | (27%) | 19 | (73%) | |
| Beasley | W | 1st | 22 | (81%) | 5 | (19%) | 1 |
| Kennedy | W | 2nd | 6 | (20%) | 24 | (80%) | |
| Sutton | B | 2nd | 10 | (36%) | 18 | (64%) | |
| Scott | W | 2nd | 9 | (41%) | 13 | (59%) | |
| Jordon | W | 3rd | 0 | ( 0%) | 22 | (100%) | 1 |
| Walker | W | 3rd | 3 | (12%) | 22 | (88%) | |
| Clark | B | 3rd | 10 | (25%) | 15 | (75%) | |
| Hensin | W | 3rd | 12 | (100%) | 0 | ( 0%) | |
| Thralkus | W | 4th | 7 | (23%) | 23 | (77%) | |
| Colwell | B | 4th | 12 | (41%) | 17 | (59%) | |
| Jones | W | 4th | 18 | (69%) | 8 | (31%) | |
| Hendrix | W | 5th | 6 | (20%) | 24 | (80%) | |
| Mallard | B | 5th | 7 | (25%) | 21 | (75%) | |
| Warten | .W | 5th | 12 | (50%) | 12 | (50%) | |
| Wilson | W | 6th | 2 | ( 8%) | 23 | (92%) | |
| Frasier | B | 6th | 10 | (38%) | 16 | (62%) | |
| Singleton | W | 6th | 21 | (84%) | 4 | (16%) | .1. |
| Harden | W | 7th | 9 | (30%) | 21 | (70%) | |
| Andrews | B | 7th | 5 | (20%) | 20 | (80%) | 1 |
| Maywood | | 7th | 13 | (54%) | 11 | (46%) | 1 |

Tattnall Elementary, 1972
Frequency Data

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---------|------|-------|--------|------|--------|------|------|
| Jordan | W | 1st | 5 | (19%) | 22 | (81%) | |
| Collins | W | 1st | 10 | (42%) | 14 | (58%) | |
| Lynn | W | 1st | 15 | (75%) | 5 | (25%) | 1 |
| Sutton | B | 2nd | 6 | (21%) | 22 | (79%) | |
| Scott | W | 2nd | 8 | (29%) | 20 | (71%) | |
| Calhoun | W | 2nd | 16 | (64%) | 9 | (36%) | |
| Kennedy | W | 2nd | 12 | (52%) | 11 | (48%) | 2 |
| Clark | B | 3rd | 7 | (23%) | 23 | (77%) | |
| Hammock | W | 3rd | 13 | (57%) | 10 | (43%) | 1 |
| Walker | W | 3rd | 7 | (24%) | 22 | (76%) | 1 |
| Caldwell | B | 4th | 5 | (17%) | 25 | (83%) | 1 |

| Teacher | Race | Grade | # of Black Students | | # of White Students | | Race Unknown |
|---|---|---|---|---|---|---|---|
| Jones | W | 4th | 7 | (23%) | 23 | (77%) | |
| Hael | W | 4th | 12 | (55%) | 10 | (45%) | |
| Hendrix | W | 5th | 10 | (34%) | 19 | (66%) | |
| Clark | W | 5th | 10 | (39%) | 18 | (46%) | 1 |
| Grover | W | 5th | 13 | (54%) | 11 | (49%) | |
| Blankenship | W | 6th | 12 | (41%) | 17 | (59%) | |
| McCall | W | 6th | 9 | (30%) | 21 | (70%) | |
| Harden | W | 6th | 8 | (31%) | 18 | (69%) | 1 |
| Hardy | B | Special Ed. | 8 | (57%) | 6 | (43%) | |

Tattnall, 1973

| Teacher | Grade | # Black | % Unknown/Total |
|---|---|---|---|
| McElroy | 5—B | 30 | 6 / 33 |
| Clark | 5—C | 47 | 10 / 29 |
| Groover | 5—A | 17 | 5 / 35 |
| McCall | 6—C | 61 | 5 / 29 |
| Maybin | 6—A | 31 | 4 / 33 |
| Harden | 6—B | 34 | 4 / 33 |

Tattnall, 1974

| Maybin | 6—C | 47 | 10 / 29 |
|---|---|---|---|
| Hudson | 6 | 37 | 8 / 35 |
| Harden | 6 | 11 | 2 / 30 |

Tattnall Elementary, 1977

| Teacher | Race | Grade | # of Black students | | # of White students | | Race Unknown |
|---|---|---|---|---|---|---|---|
| Murphy & Jeffers | X W | Special Ed. | 23 | (55%) | 19 | (45%) | |
| Deltoss | W | 1st | 4 | (17%) | 19 | (83%) | |
| Lee | W | 1st | 5 | (23%) | 17 | (77%) | |
| Roundtree | X | 1st | 10 | (53%) | 9 | (47%) | |
| Coleman | W | 2nd | 3 | (10%) | 27 | (20%) | |
| Kennedy | W | 2nd | 12 | (40%) | 18 | (60%) | |
| Warren | W | 2nd | 15 | (48%) | 16 | (52%) | |

| Teacher | Race | Grade | # of Black Students | # of White Students | Race Unknown |
|---------|------|-------|---------------------|---------------------|--------------|
| Christopher | W | 3rd | 9 (56%) | 7 (44%) | |
| Ford | W | 3rd | 0 ( 0%) | 12(100%) | |
| Hopper | W | 3rd | 13 (59%) | 8 (41%) | |
| Colwell | X | 4th | 3 (10%) | 28 (90%) | |
| Fowler | W | 4th | 8 (26%) | 21 (74%) | |
| Jones | W | 4th | 12 (55%) | 10 (45%) | |
| Burke | W | 5th | 12 (55%) | 10 (45%) | |
| Clark | W | 5th | 3 (13%) | 20 (87%) | |
| Groover | W | 5th | 8 (33%) | 16 (67%) | |
| Harden | W | 5th | 14 (64%) | 8 (36%) | |
| Hudson | W | 6th | 3 (17%) | 15 (83%) | |
| Maybin | W | 6th | 10 (38%) | 16 (62%) | |

Tattnall Elementary, 1978

| Teacher | Race | Grade | # of Black students | # of White students | Race unknown |
|---------|------|-------|---------------------|---------------------|--------------|
| Hall | W | K | 9 (33%) | 18 (67%) | |
| Cunningham | X | K | 7 (25%) | 21 (75%) | |
| Clark | B | K | 6 (38%) | 10 (62%) | |
| Lee | W | 1st | 12 (67%) | 6 (33%) | |
| Kent | W | 1st | 10 (36%) | 18 (63%) | |
| Deboss | W | 1st | 3 (10%) | 26 (90%) | |
| Warren | W | 2nd | 4 (20%) | 16 (80%) | |
| Kennedy | W | 2nd | 12 (67%) | 6 (33%) | |
| Coleman | W | 2nd | 4 (20%) | 16 (80%) | |
| Parker | W | 3rd | 3 (10%) | 26 (90%) | |
| Ford | W | 3rd | 12 (48%) | 13 (52%) | |
| Brown | W | 3rd | 11 (46%) | 13 (54%) | |
| Murphy & Jeffers | B X | Special Ed. | 12 (71%) | 5 (29%) | |
| Fowler | W | 4th | 9 (69%) | 5 (31%) | |
| Davis | W | 4th | 2 (11%) | 17 (89%) | |
| Colwell | B | 4th | 6 (38%) | 10 (62%) | |
| Hopper | W | 5th | 13 (59%) | 9 (41%) | |
| Clayton | W | 5th | 4 (16%) | 21 (84%) | 1 |
| Clark | W | 5th | 8 (28%) | 21 (72%) | |
| Maybin | W | 6th | 12 (52%) | 11 (48%) | |
| Hudson | W | 6th | 7 (29%) | 17 (71%) | |
| Harden | W | 6th | 2 ( 8%) | 24 (92%) | |

Tattnall Elementary, 1979
Frequency Data

| Teacher | Race | Grade | # of Black students | # of White students | Race Unknown |
|---------|------|-------|---------------------|---------------------|--------------|
| Coleman | W | 1st | 4 (14%) | 24 (86%) | |
| Price | W | 1st | 8 (28%) | 21 (72%) | |
| Kennedy | W | 1st | 10 (45%) | 12 (55%) | |
| Clayton | W | 2nd | 3 (10%) | 26 (90%) | |
| Warren | W | 2nd | 10 (36%) | 18 (64%) | |
| Glisson | W | 2nd | 12 (60%) | 8 (40%) | |
| Hilton | W | 3rd | 4 (17%) | 20 (83%) | 1 |
| Ford | W | 3rd | 10 (56%) | 8 (44%) | |
| Parker | W | 3rd | 3 (20%) | 12 (80%) | |
| Davis | W | 4th | 12 (48%) | 13 (52%) | |
| Fowler | W | 4th | 3 (10%) | 28 (90%) | |
| Balkcom | W | 5th | 2 (11%) | 17 (89%) | |
| Blankenship | W | 5th | 12 (67%) | 6 (33%) | |
| Colwell | B | 4th | 11 (58%) | 8 (42%) | |
| Murphy | B | Special Ed. | 11 (69%) | 5 (31%) | |
| Clark | W | 5th | 4 (24%) | 13 (76%) | |
| Maybin | W | 6th | 4 (14%) | 24 (86%) | 1 |
| Hudson | W | 6th | 11 (46%) | 13 (52%) | |